(No. 42728.—

ROBINHORNE CONSTRUCTION CORPORATION *et al.,* Appellants, *vs.* JACK O. SNYDER *et al.,* Appellees.

*Opinion filed Nov. 17, 1970.—Rehearing denied Jan. 27, 1971.*

Underwood, C.J., took no part.

Phillips, Phebus & Tummelson, of Urbana, Sebat, Swanson & Banks, of Danville, and Summers, Watson & Kimpel, of Champaign, for appellants.

Thomas, Mulliken & Mamer, of Champaign, and Dunn, Dunn, Brady, Goebel, Ulbrich & Hayes, of Bloomington, (Stuart M. Mamer, Albert F. Manion, and Merrick C. Hayes, of counsel,) for appellees.

Mr. Justice Schaefer delivered the opinion of the court:

This case arises out of a contract under which Robinhorne Construction Corporation, Red Arrow Construction, Inc., and Orin L. Robson (Contractors) were to erect a Howard Johnson Motor Lodge for Jack O. Snyder (Owner). While the project was under construction, a dispute arose, and Robinhorne instituted an action in the circuit court of Champaign County against Red Arrow, Robson, and Snyder for a declaratory judgment, an accounting, and damages. The Owner subsequently terminated the contract, and the Contractors then filed suit to enjoin the Owner from completing the project and to recover the balance due to them as reimbursement for their expenditures plus a fee of six percent of the cost of the work completed prior to termination, to which they claimed they were entitled under

the contract. The Owner filed a counterclaim against the Contractors and their surety, United States Fidelity and Guaranty Company, to recover the costs he incurred in completing the contact, together with costs, fees and expenses of suit. The two cases were consolidated, a jury was waived, evidence was heard, and the trial court entered judgment against the Contractors on their claims, and for the Owner on his counterclaim. The appellate court, fourth district, affirmed (113 Ill. App. 2d 288), and we granted leave to appeal.

In April, 1965, the Owner employed an architect to prepare plans and specifications for the construction of a Howard Johnson motel and restaurant complex on the Owner's land in Urbana. The project was then put out for lump-sum bids, but only one general bid was received, and it was rejected as too high. Thereafter the Owner contacted Robinhorne Construction Corporation and on July 10, 1965, entered into a contract with it for the construction of the unit. The written agreement executed by the parties was a 1951 form contract recommended by the American Institute of Architects. The form stated that it was to be used "when the cost of the work plus a fee forms the basis of the contract" and that it was to be used "only with the Institute's standard general conditions of the contract, Sixth Edition, 1951 * * *." The parties did not use the Institute's standard general conditions, however, but rather attached the conditions which had been prepared by the architect for the lum-sum bidding. Nor did they use article 4 of the form contract which was to be filled in with the contractor's appropriate compensation, but rather attached a typewritten rider to article 4 which provided that the contractor was to be paid the "cost of the improvements, plus 6%; provided, however, the cost plus 6% shall not exceed '1,018,700.00'."

The contract required Robinhorne, as general contractor, to provide a performance bond in the amount of $1,018,-

700.00. Shortly after the contract was executed, however, Robinhorne discovered that the premium for such a bond was substantially more than it had anticipated. Thereupon, Robinhorne contacted Red Arrow Construction, Inc., about becoming a joint venturer on the project, to which Red Arrow agreed. Thereafter, on September 21, 1965, Robinhorne sent a letter to the Owner in which it explained that Red Arrow had agreed to become a joint venturer, and proposed that the performance bond for the general contract work which was to be furnished by the joint venture contractors be reduced to $500,000; that subcontractors be obtained for the mechanical, electrical, masonry, store front and dry wall portions of the buildings, who would furnish performance bonds for their respective portions of the contract; and that a new contract be entered into by all parties. The letter stated: "We agree that the total cost to you for the complete construction, according to the plans and specifications incorporated into the original agreement of July 10, 1965, will not exceed $1,018,700.00, and affirm and ratify, thereby making a part of this agreement, the provisions of that original agreement relating to this total price, * * *. The purpose of the execution of the new contract, also dated the 10th day of July, 1965, is solely to add as an additional party to the contract, Orin Robson, [the president of Red Arrow Construction] and to facilitate the bonding of the over-all project and thereby affecting a saving in the bonding fee."

The Owner agreed to the changes stated in the letter and prepared another AIA form contract for execution. This was a 1963 form, but it was substantially the same as the 1951 form, and differed mainly in the numbering system of the provisions. The form was headed "where the basis of payment is the COST OF THE WORK PLUS A FEE" and stated: "This form to be used only with the latest edition of AIA document A201, general conditions of the contract." Again the corresponding general condi-

tions were not used, and the conditions which had originally been drawn for the lump-sum bidding, and which were appended to the first contract, were adopted unchanged into the new contract. The contractor's fee was again expressed in a rider to the payment provision of the contract, article 5. This rider was identical to the payment rider of the first contract except that the maximum price was reduced from $1,018,700 to $500,000, as the parties had agreed. The rider provided:

"Owner agrees to pay the contractor for the work to be done, cost of the improvements, plus 6%, provided, however, that the cost plus 6% does not exceed $500,000. The parties hereto, in computing the above maximum figure agree that it is comprised of a base figure of $269,960.00 for the Motor Lodge, plus the contractor's bond in the amount of $5,290.00, plus the following items and amounts: (a) Sauna Baths $3,000 (b) Dumb Waiter 3,000 (c) Demolition 3,700, (d) Laundry 6,000 (e) Pool and filters 18,000 (f) Landscaping 10,000 (g) Incinerator 800 (h) Gas lighting of pool area 500 * * *.

"In the event that actual costs of any of the items (a) through (h) are greater than the above amounts, the increment shall be added to the maximum of the contract of $500,000. In the event the cost is less than the amounts shown above, such reduction shall be deducted from the maximum.

"In the event that the total cost, plus 6%, is less than the maximum of $500,000, as adjusted by the previous paragraph, the contractor shall be entitled to receive 50% of the difference between the cost plus 6% and said maximum amount; * * *."

On October 19, 1965, the contract was signed and backdated to July 10, 1965, and at that time the performance bond of the surety, United States Fidelity and Guaranty Company, in the amount of $500,000 was delivered to the Owner.

The contract had a completion date of February 1, 1966, but the construction was still incomplete in June, 1966, when several meetings were held to discuss the delay. The cause of the delay was disputed, but it became apparent that the job was in financial difficulty. The Owner discussed the matter with representatives of the bonding company, and considerable correspondence passed between the parties as to the date and cost of completion. In late June, representatives of Howard Johnson Company threatened to cancel the Owner's lease and franchise agreement if the restaurant was not completed within 30 days. During the latter part of June and the early part of July, 1966, the work proceeded at an extremely slow rate; testimony was given that few, if any, workers remained on the job and that the construction superintendent had been removed and sent back to Wichita, Kansas. On July 11, 1966, Robinhorne filed its action for a declaratory judgment, an accounting, and damages. By July 18, the construction had come to a virtual standstill, and on July 20, 1966, the Owner delivered a copy of a notice of contract termination to Orin L. Robson and his attorney. The bonding company was notified of the contract termination by letters dated July 22 and 28, 1966.

In August, 1966, the Contractors filed the second suit to enjoin the Owner from completing construction and to recover $88,148.55 in damages to reimburse them for payments made prior to termination, plus a fee of 6%. The Contractors moved from the job site August 12, 1966. The Owner completed the project himself and did not rent any equipment from the Contractors. The appellate court, in affirming the judgment of the trial court, first determined that the final contract between the parties was not simply a cost-plus contract as the Contractors had contended, but a cost-plus contract with a maximum price provision. It then rejected the Contractors' arguments that article 16 of the contract entitled them to reimbursement for the payments made by them prior to termination, plus a 6% fee, and pro-

hibited the Owner from recovering the costs he incurred in completing the project.

Both article 16 and paragraph 18 of the general conditions provided for termination of the contract. Article 16 is the provision of the AIA's cost-plus contract form and provides:

"The provisions of this Article supersede all of Article 22 of the General Conditions of the Contract except the first sentence.

"If the Owner should terminate the Contract under the first sentence of Article 22 of the General Conditions of the Contract, he shall reimburse the Contractor for the balance of all payments made by him under Article 6 [reimbursable items including all material, labor, and subcontracts], plus a fee computed upon the cost of the work to date at the rate of percentage named in Article 5 hereof [6%], or if the Contractor's fee be stated as a fixed sum, the Owner shall pay the Contractor such an amount as will increase the payments on account of his fee to a sum which bears the same ratio to the said fixed sum as the cost of the work at the time of termination bears to a reasonable estimated cost of the work completed, and the Owner shall also pay to the Contractor fair compensation, either by purchase or rental, at the election of the Owner, for any equipment retained."

Paragraph 18 of the general conditions, on the other hand, was prepared by the Owner's architect when the project was to be put out for lump-sum bids and is a typical termination provision of a lump-sum contract. It provides: "If at any time the contractor fails to comply with the provisions of this contract or if he becomes insolvent or insolvency or backrupty proceedings are instituted by or against him or if he does not act with promptness and direction reasonable [sic] to warrant the expectations that the contract shall be completed within the time limit set forth in the agreement, the owner may immediately, without prejudice to any other right or remedy, evict the contractor and

take possession of the premises and of all material, tools and appliances thereon and finish the work by any method whatever he may deem expedient. In any case, the contractor may not be entitled to receive any further payment until the work is finished. If the unpaid balance of the contract price shall exceed the expenses of finishing the work, including but not limited to, compensation for additional managerial and administrative services, such excess shall be paid to the contractor. If such expenses shall exceed such unpaid balance, the contractor shall pay the difference to the owner and such other damages as the owner may have sustained."

The appellate court concluded that the Owner elected to terminate under paragraph 18 of the general conditions of the contract.

The Contractors contended in the appellate court, and they renew the contention here, that termination of the contract was exclusively governed by article 16. They argue that the first sentence of that article, which provides that article 16 is intended to supersede all of general condition 22 except the first sentence, was actually intended to supersede general condition 18. They point out that general condition 18 is substantially the same as general condition 22 of the AIA form conditions to which article 16 refers, while the general condition numbered 22 in the contract is addressed to the provision of guaranty bonds. The first sentence of condition 18 is exactly the same as the first sentence of form condition 22 in its statement of reasons for which the owner may terminate, and the Contractors argue that the appellate court, in holding that general condition 18 was not superseded by article 16, has exalted form over substance and thereby changed the agreement of the parties. Further, they argue that even if article 16 was not intended to supersede general condition 18, article 1 of the contract provides that the agreement is to govern if the agreement and general conditions are inconsistent. And be-

cause this is a cost-plus contract, "everything in such a General Condition, as 18 or 22, would be inconsistent with the contract itself. The essential prerequisite of the exactness of a bid price would be lacking and the measure of damages designed for lump sum contracts could not be applied to a cost plus contract because of such indefiniteness of the contract price." The Contractors conclude, therefore, that article 16 is to be followed, and "[s]ince Article 16 did not contemplate that completion costs after termination were to be considered, the owner's proof of his completion costs in such a case was improper and inadmissible."

The fulcrum of the Contractors' argument is their contention that the parties had entered into a pure cost-plus agreement. After a review of the record, however, we cannot agree. Rather we think it is clear that the parties intended to, and did, enter into a hybrid form of contract which had elements of both a cost-plus and a lump-sum contract. We think the rider to article 5 means what it says— that the Contractors were to be reimbursed for their costs and paid a fee of 6%, but that those payments were not to exceed a maximum of $500,000. See *Wuellner* v. *Illinois Bell Telephone Co.* (1945), 390 Ill. 126.

The Contractors paid a premium of $3600 for their performance bond which accorded with the rates then applicable for a $500,000 fixed price contract. This rate was approximately $2100 more than the premium for a performance bond to secure a cost-plus contract in the same amount. Dean Robinson, the president of Robinhorne, testified that at a meeting between the parties on June 9, 1966, Orin Robson, the president of Red Arrow, remarked to him that he should forget about his share of the profits and begin to think about his share of the losses. There could be no losses to share if Robson had understood the agreement to be a cost-plus contract. Robinson also testified that it was his understanding that under the original contract he signed with the Owner, any expenses over the maximum price were

to be borne by the contractor. Finally, Robinhorne's letter of September 21, 1965, seems to confirm beyond doubt that the Owner's payments to the Contractors were limited by the maximum figure of $500,000. That letter stated: "We agree that the total cost to you for the complete construction * * * will not exceed $1,018,700.00, and affirm and ratify, thereby making a part of this agreement the provisions of that original agreement relating to total price." We cannot accept the explanation that the $500,000 figure was merely "for the purpose of providing a base or estimated figure from which to calculate the additional compensation contractors were to receive in the event the project was completed within the upset price."

This is the kind of case that has been described as "one where no principle of law is involved, but only the meaning of careless and slovenly documents." (See Devlin, Samples of Lawmaking, Oxford Press (1959), p. 5.) The parties used a standard cost-plus contract form. They modified it to specify a maximum price, but they failed to modify the termination provision. The conditions that they attached had been prepared for use with a lump-sum contract. Thus article 16's statement: "If the Owner should terminate the Contract under the first sentence of Article 22 of the General Conditions of the contract" is meaningless. The first sentence of article 22 of the general conditions does not relate to termination, but is concerned with the Contractors' bond.

To say, as the Contractors would have us say, that article 16 should be read as referring to article 18, rather than article 22, of the general conditions, would simply shift the difficulty from one portion of the contract to another. There would then be no way in which the Owner could protect himself against increased cost or from delays caused by the Contractors. Since it is clear that both parties intended to limit the total cost of the project to the Owner, neither party could have intended that after the Owner had

terminated the contract because the Contractors had failed to meet time and cost requirements before the work was finished, the Contractors were entitled to finish the job at their leisure and be paid the amount of their expenditures plus a fee of 6%, regardless of the total amount of those expenditures. We think, therefore, that the applicability of article 16 was limited to a termination that occurred at a time when the project could still be completed within the maximum price, and that article 16 was not intended to prevent the defendant from recovering damages in the event that the actual costs of construction exceeded the maximum price provided in the contract. See *Bethers* v. *Wood* (1960), 10 Utah 2d 313, 352 P.2d 774; *Zancanaro* v. *Cross* (1959), 85 Ariz. 394, 339 P.2d 746.

The judgment of the appellate court is affirmed.

*Judgment affirmed.*

Mr. CHIEF JUSTICE UNDERWOOD took no part in the consideration or decision of this case.