831 F.2d 291
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
SALUS CORPORATION, Plaintiff--Appellant
v.
Morton L. OLSHAN, Richard P. Steinberg, Vincent Guerriero,
Frank L. Flautt, W. Jefferies Mann, Wilton D.
Hill, Flautt & Mann Properties, Inc.,
Defendant--Appellees
 No. 86-2060.
 United States Court of Appeals, Fourth Circuit.
 Argued: Jan. 7, 1987.
Decided: Oct. 9, 1987.
 
 Before SPROUSE and ERVIN, Circuit Judges, and FRANK A. KAUFMAN, Senior United States District Judge for the District of Maryland, sitting by designation.
 Edgar T. Bellinger (Elena W. King, Zucker, Scoutt, Rasenberger & Johnson, Alan B. Croft, Hazel, Beckhorn & Hanes on brief) for appellant.
 Robert F. Condon (Mark London, Finley, Kumble, Wagner, Heine, Underberg, Manley & Casey on brief) for appellees.
 PER CURIAM:
 
 
 1
 On May 11, 1983, Salus Corporation (Salus), the contractor, entered into a contract with Olshan, Guerriero, Steinberg, Flautt and Mann (Owners)[1] for the construction of a Holiday Inn in Fairfax County, Virginia, using The American Institute of Architects Standard Form of Agreement Between Owner and Contractor (AIA Document A111) (the Agreement) and the General Conditions of the Contract for Construction (AIA Document A201) (the General Conditions). The parties agree that construction was to begin upon notice from the Owners to Salus to proceed, and that completion of the contract work was to be achieved within 455 days of such notice to Salus. After the Owners gave Salus notice to proceed as of May 25, 1983, Salus commenced work. The district court found that the original completion date, as extended because of change order 19, was August 4, 1984. However, in the fall of 1983, it became evident that the subcontractors hired by Salus were falling behind schedule in connection with structural concrete work. By June 1984, when it was clear that numerous delays in construction would preclude completion by August 4, 1984, the parties agreed to a new completion date, namely, October 15, 1984. Subsequently, by letter dated September 17, 1984, Salus informed the Owners that completion by October 15, 1984 could not be achieved. In that context, the parties discussed a partial opening date for the hotel around Thanksgiving. In fact, a partial opening occurred on December 10, 1984. By letter dated December 18, 1984, the Owners directed Salus to complete the contract forthwith and expressed serious concern about the delays. After Salus' president was unable to provide the Owners with a firm completion date, the Owners, by letter dated December 31, 1984, terminated the contract with Salus effective January 6, 1985. Work on the project by Salus stopped on January 2, 1985. The Owners thereupon undertook to complete the project, and finally achieved completion on February 15, 1985. Thereafter, Salus instituted the within case for breach of contract against the Owners. The latter denied the said allegations of Salus and, in addition, filed a counterclaim against Salus, alleging that it was Salus which had wrongfully breached the contract. Diversity of citizenship jurisdiction is present.
 
 
 2
 After a nonjury trial, the district court concluded that: (1) Salus breached the construction contract by failing, without justifiable excuse, timely to complete the project; (2) the Owners were accordingly justified in terminating the contract; (3) Salus was not entitled to recover on its complaint; and (4) the Owners were entitled to recover on their counterclaim. We affirm each of those determinations by the district court.
 
 
 3
 The district court, after making the above set forth determinations, awarded $930,397.05 in compensatory damages to the Owners. Later, the district court reduced that award to $875,031.23. For the reasons discussed infra, we hereby remand the within case to the district court for a redetermination of damages.
 
 LIABILITY
 
 4
 The trial court made full and specific findings of facts concerning the events in this case, and found that while certain of the delays were the fault of the Owners, all of the critical delays were the responsibility of Salus. The trial court also concluded that the extensions granted by the Owners to Salus did not constitute a waiver of the right of the Owners to terminate the contract if Salus, despite the extensions granted to it, failed thereafter timely to complete the job. In point of fact, in this case, after more than one extension, Salus had still not completed its work. Also, there is more than sufficient evidence to support the finding of the district court that the Owners gave both reasonable opportunity to Salus to complete, and reasonable notice to Salus that the Owners would exercise the right to terminate if, despite the extensions, Salus continued its failure timely to perform all of its contractual obligations. That is all that the Owners were required to do under the contract documents and applicable Virginia case law.[2]
 
 DAMAGES
 
 5
 Article 5[3] of the Agreement between the Owner and Contractor (A1A Document A111), (hereinafter called "Agreement"),[4] provides as follows:
 
 
 6
 5.1 The Owner agrees to reimburse the Contractor for the Cost of the Work as defined in Article 8. Such reimbursement shall be in addition to the Contractor's Fee stipulated in Article 6.
 
 
 7
 5.2 The maximum cost to the Owner, including the Cost of the Work and the Contractor's Fee, is guaranteed not to exceed the sum of Seven Million Four Hundred Seventy-One Thousand Nine Hundred Dollars ($7,471,900.00); such Guaranteed Maximum Cost shall be increased or decreased for Changes in the Work as provided in Article 7.
 
 
 8
 At the completion of the work, coincident with the Contractor's Final Application for Payment, and upon receipt of an audit acceptable to the Owner, if the audited Final Total Cost of the Work and Contractor's Fee is less than the Guaranteed Maximum Cost, the savings (difference) shall be distributed as follows:
 
 
 9
 The Contractor shall receive as a bonus 25% of the savings; the remainder will be retained by the Owner.
 
 
 10
 Notwithstanding the foregoing, the Owner shall be entitled to one hundred percent (100%) of the savings resulting from any design or specification changes reducing the scope of the work, and the Contractor shall not receive any additional bonus attributable to such savings.[5]
 
 Article 6.1 of the Agreement provides:
 
 11
 In consideration of the performance of the Contract, the Owner agrees to pay the Contractor in current funds as compensation for his services a Contractor's Fee as follows:
 
 
 12
 Fixed Fee of $374,000.00.
 
 Article 15 of the Agreement states:
 
 13
 15.1 The Contract may be terminated by the Contractor as provided in the Contract Documents.
 
 
 14
 15.2 If the Owner terminates the Contract as provided in the Contract Documents, he shall reimburse the Contractor for any unpaid Cost of the Work due him under Article 5, plus (1) the unpaid balance of the Fee computed upon the Cost of the Work to the date of termination at the rate of the percentage named in Article 6, or (2) if the Contractor's Fee be stated as a fixed sum, such an amount as will increase the payments on account of his Fee to a sum which bears the same ratio to the said fixed sum as the Cost of the Work at the time of termination bears to the adjusted Guaranteed Maximum Cost, if any, otherwise to a reasonable estimated Cost of the Work when completed. The Owner shall also pay to the Contractor fair compensation, either by purchase or rental at the election of the Owner, for any equipment retained. In case of such termination of the Contract the Owner shall further assume and become liable for obligations, commitments and unsettled claims that the Contractor has previously undertaken or incurred in good faith in connection with said Work. The Contractor shall, as a condition of receiving the payments referred to in this Article 15, execute and deliver all such papers and take all such steps, including the legal assignment of his contractual rights, as the Owner may require for the purpose of fully vesting in himself the rights and benefits of the Contractor under such obligations or commitments.
 
 
 15
 Section 14.2.2[6] of the General Conditions of the Contract for Construction (A1A Document A201), (hereinafter called "General Conditions"),[7] states:
 
 
 16
 If the unpaid balance of the Contract Sum exceeds the costs of finishing the Work, including compensation for the Architect's additional services made necessary thereby, such excess shall be paid to the Contractor. If such costs exceed the unpaid balance, the Contractor shall pay the difference to the Owner. The amount to be paid to the Contractor or to the Owner, as the case may be, shall be certified by the Architect, upon application, in the manner provided in Paragraph 9.4, and this obligation for payment shall survive the termination of the Contract.
 
 Article 1 of the Agreement[8] provides:
 
 17
 The Contract Documents consist of this Agreement, the Conditions of the Contract General, Supplementary and other Conditions, the Drawings, the Specifications, all Addenda issued prior to and all Modifications issued after execution of this Agreement. These form the Contract, and all are as fully a part of the contract as if attached to this Agreement or repeated herein. An enumeration of the Contract Documents appears in Article 16. If anything in the Contract Documents is inconsistent with this Agreement, the Agreement shall govern.[9]
 
 
 18
 In its March 12, 1986 Memorandum Opinion the district court stated that the parties had entered into a "cost plus" contract.[10] The provisions of Article 15.2 of the Agreement support that conclusion. However, the provisions of Article 14.2.2 of the General Conditions suggest that the agreement is for payment of a fixed sum. Further, the combination of the provisions of Articles 5 and 15.2 of the Agreement and Article 14.2 of the General Conditions suggests a hybrid agreement. See Robinhorne Construction Corp. v. Snyder, 47 Ill.2d 349, 265 N.E.2d 670 (1970), in which Justice Schaeffer characterized a contract similar in some respects to the one here in issue as a "hybrid form of contract [with] elements of both a cost-plus and a lump-sum contract." Id. 265 N.E.2d at 674.
 
 
 19
 In their termination letter of December 31, 1984,[11] the Owners wrote that "the certain Agreement dated May 11, 1983, by and between Salus Corporation and Fair Oaks Motel, for construction of a Holiday Inn at Fair Oaks, Virginia, is being terminated by the Owner in accordance with the provisions of Article 14, Section 14 of the General Conditions of said Agreement as a result of your breaches of the said Agreement." Salus, the Contractor, emphasizing those words used on December 31, 1984 by the Owners, contends that the Owners elected to proceed under Article 14 of the General Conditions and that accordingly the provisions of that Article govern herein. The Owner, on the other hand, takes the position that the provisions of Article 15 of the Agreement and of Article 14.2.2 of the General Conditions are inconsistent with one another and that pursuant to Article 1 of the Agreement, the former, i.e., Article 15 of the Agreement, controls. Salus, the Contractor, in response, states that there is no such inconsistency and that what is involved in this case is a hybrid type of agreement containing cost-plus and fixed-sum elements. Additionally, the Owners argue that in any event the General Conditions are not intended for use with the Agreement. However, A1A Document A111 explicitely states: "Use only with the 1976 Edition of A1A Document A201, General Conditions of the Contract for Contruction."[12]
 
 
 20
 The district court in its Memorandum Opinions of March 12, 1986 and April 16, 1986 set forth a number of specific findings and conclusions but seemingly did not, in either such document or in any colloquy with counsel during on-the-record court proceedings, specifically determine whether Article 15 of the Agreement and Article 14.2.2 of the General Conditions are in conflict, and if so, to what extent they are in conflict, and, in any event, which one controls. Nor did the district court determine whether the totality of the contract documents constitutes a hybrid Agreement, and if the latter, how damages are to be calculated.
 
 
 21
 Under a cost-plus type of arrangement, the contractor is entitled to receive his costs plus a fee, i.e., his agreed profit. Sometimes, the fee is a percentage of costs; sometimes it is a fixed sum. In this case, as Article 5 of the Agreement makes clear, the fee, if the Contractor completes the contract work in accordance with the Contractor's obligations, is a fixed sum of $374,000.00, subject to modification because of change orders.[13] In a cost-plus situation, the contractor can expect to receive a percentage of his fixed fee if the contract is terminated by the Owner before completion of the contract work.
 
 
 22
 Salus, the Contractor, claims that the costs incurred by the Owners in completing the work, plus such damages as the Owners suffered because of the delays, should be offset by the unpaid balance of the contract price. That contention is consistent with Article 14.2.2 of the General Conditions and a fixed-sum approach. The Owners contend that the only offset to which Salus is entitled is the unpaid balance due for work performed by the Contractor when the contract was terminated. Article 15.2 of the Agreement and a cost-plus approach support that view. However, in this instance, a hybrid type of agreement may be involved. In Robinhorne, supra, Justice Schaeffer took the view that in a case with a hybrid contract of substantially the type involved in this case, the cost-plus contractual provisions control "when the project could still be completed within the maximum price" and that the fixed-sum contractual provisions controlled "in the event that the actual costs of construction exceeded the maximum price provided in the contract." Id. at 675.
 
 
 23
 In the instant case there has been no determination by the district court concerning the interplay between the possibly conflicting provisions of Article 15 of the Agreement and Article 14.2.2 of the General Conditions.
 
 
 24
 On remand, the district court should determine, inter alia, the following: (1) Are the provisions of Articles 14 and 15 of the contract in conflict, and if so, to what extent, and if so, to what extent does each one control? (2) Is the contract a "cost-plus", "fixed-sum" or "hybrid" contract? (3) What is the effect of the Owner's reliance on Article 14 of the General Conditions in the December 31, 1984 termination letter? On remand, after making determinations with regard to those questions and such other questions as may be relevant and material, the district court will need to recalculate and award damages.[14]
 
 MEASURE OF DAMAGES
 
 25
 The following principles of law would appear applicable on remand:
 
 
 26
 (1) If the provisions of Article 15 control in this case, then Salus is entitled to reimbursement for all costs appropriately incurred by Salus pursuant to the terms of the contract, up to the date of termination.
 
 
 27
 (2) Salus claims that the total sum of money withheld by the Owners as retainage pursuant to Article 14.2 of the Agreement is owed to Salus for actual costs incurred under the contract by Salus for which Salus has not been paid and that such sum must, therefore, be credited to Salus and set off against any damages which may be awarded to the Owners for Salus' breach of the contract.[15] In that regard, whether "cost-plus" or "fixed-sum" principles control in this case, if Salus has not been paid by the Owners for any portion of Salus' actual costs, then Salus is entitled to credit for such unpaid actual costs. See, e.g., Roanoke Hospital Association v. Doyle & Russel, Inc., 215 Va. 796, 214 S.E.2d 155, 162 (1975), (fixed-sum contractor entitled to retainage).
 
 
 28
 (3) When cost-plus principles completely control, the owners are not entitled to recover from the contractor any post-termination costs incurred in connection with the completion of the contract. See Kerner v. Gilt, 296 So.2d 428, 433 (La.App.1974). Herein, in this case, in which there apparently are hybrid provisions and in which there was a ceiling placed upon costs, see Article 5 of the Agreement, the Owners may be entitled to reimbursement if the total of (a) the amounts paid to Salus and (b) the appropriate post-termination completion costs exceed the maximum guaranteed price.
 
 
 29
 (4) Whether "fixed-sum" or "cost-plus" principles control, the Owners are entitled, in either event, to recover damages caused by Salus' breach of the contract, even if they are not entitled to recover the appropriate post-termination costs of completion incurred by the Owners. See, e.g., Pebble Building Co. v. G.J. Hopkins, Inc., 223 Va. 188, 288 S.E.2d 437 (1982). See also Roanoke Hospital Association, 214 S.E.2d at 160 dealing with a "cost-plus" situation.
 
 
 30
 (5) Salus contends that whether or not Salus breached the contract and whether or not a fixed-sum, cost-plus or hybrid type of agreement is involved, Salus is entitled to recover the unpaid contract price minus the applicable damages because Salus had substantially performed under the contract. The district court concluded that Salus had performed 80-85% of the contract work by the date of termination.[16] But the district court did not make an explicit determination concerning whether such performance was sufficient to constitute "substantial performance" thereby allowing Salus to recover under that doctrine. See, e.g., T.C. Allen Construction Co. v. Stratford Corp., 384 F.2d 653, 658 (4th Cir.1967) (applying North Carolina Law); Formigli Corp. v. Fox, 348 F.Supp. 629, 645 (E.D.Pa.1972) (applying Pennsylvania law); Restatement, Second, Contracts Sec. 237 comment d. On remand, the district court should make specific determinations concerning substantial performance vel non.
 
 
 31
 AFFIRMED IN PART AND REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.
 
 
 
 [1]
 Those five individuals are appellees herein. In addition, the appellant, Salus, has listed Wilton D. Hill and Flautt & Mann Properties, Inc. as appellees. However, Mr. Hill and Flautt & Mann were named defendants only in connection with allegations which the district court dismissed. Salus has not appealed that dismissal
 
 
 [2]
 See Huselton v. Roop, 215 Va. 127, 207 S.E.2d 826, 827 (1974); Appalachian Power Co. v. John Stewart Walker, Inc., 214 Va. 524, 201 S.E.2d 758, 767 (1974); Schulze v. Kwik-Chek Realty Co., Inc., 212 Va. 111, 181 S.E.2d 629, 631 (1971). See also Tiedman v. American Pigment Corp., 253 F.2d 803, 807 (4th Cir.1958). See generally Dallas-Fort Worth Regional Airport Board v. Combustion Equipment Associates, Inc., 623 F.2d 1032, 1036-37 (5th Cir.1980)
 
 
 [3]
 App. 107
 
 
 [4]
 App. 103 et seq
 
 
 [5]
 Article 8 defines "costs."
 
 
 [6]
 App. 144
 
 
 [7]
 App. 130 et seq
 
 
 [8]
 App. 104
 
 
 [9]
 There is a liquidated damage clause set forth in Article 4.2 of the Agreement. However, it is applicable only during a certain period of time after the contract completion date, as extended, and is seemingly of no effect herein
 
 
 [10]
 App. 30
 
 
 [11]
 App. 185
 
 
 [12]
 App. 103. The AIA Document A201 used by the parties herein was the 1976 edition
 
 
 [13]
 Article 6.2 at App. 107-08
 
 
 [14]
 Article 14.2.1, by its own terms, becomes applicable only "upon certification by the Architect or Owner's representative that sufficient cause exists...." Herein, there has seemingly been no such certification. There is also a seven-day notice provision in Article 14.2.1 with which the Owners, seemingly, did not comply. The district court deemed those failures inconsequential. (App. 45). Salus has not questioned those determinations during the within appeal and we accept them as reasonable
 
 
 [15]
 Salus contends that the Owners have withheld $765,304.00 as retainage, and that that amount should be so set off against any damage award in favor of the Owners
 
 
 [16]
 App. 38