ROLAND L. McBRIDE, Plaintiff-Appellant, v. PENNANT SUPPLY COR-
PORATION, Defendant-Appellee (Gene L. Lyerla, Plaintiff).

Fifth District   No. 5—92—0332

Opinion filed November 22, 1993.

Harris, Lambert, Howerton, Dorris & Eckiss, of Marion, for appellant.

Wolff & Jones, of Murphysboro, for appellee.

JUSTICE MAAG delivered the opinion of the court:
The plaintiff-appellant, Roland L. McBride, appeals from a judg-
ment of the circuit court of Jackson County, contending that the cir-
cuit court erred when it determined that: (1) it was required to accept
the stock valuation of the corporate accountant, William Springer; (2)
no evidence was presented which allowed the circuit court to find that
the corporate accountant's stock valuation was in error; (3) the stock
valuation which was submitted by defendant-appellee, Pennant Supply
Corporation (Pennant), was in conformity with the "Purchase and
Sale Agreement" (Agreement); and (4) McBride's stock value should
be one-half of its face value.

The relevant facts are as follows: Pennant is a wholesale distribu-
tor of mechanical products such as plumbing, electrical, heating, air-
conditioning, and refrigeration equipment. In April of 1968, McBride
was hired by Pennant to do its accounting or bookkeeping while he
was studying accounting at Southern Illinois University in Carbon-
dale. At approximately the same time, Pennant hired Gene Lyerla

and Elbert Gualdoni, Mrs. Margaret Evans' cousin. Although McBride had approximately 20 to 25 hours remaining to obtain his accounting degree, he decided he would not finish his education at that time. McBride worked with Richard Boyd, a certified public accountant, to organize Pennant's books and records in a proper accounting format. Boyd was an independent accountant who prepared the tax returns for Pennant and, at times, rendered advice to the corporation.

In 1971, McBride became Pennant's secretary. Shortly thereafter, David Evans became the sole shareholder of the corporation. Eventually, Mr. Evans became concerned that the corporation was in need of capital. In fact, according to McBride, Mr. Evans had considered selling the corporation. McBride testified that, instead, Mr. Evans promised that if they would stay with him and work through the difficult times, he would reward them and involve them in the corporation. On February 28, 1975, Pennant entered into an Agreement with McBride, Gualdoni, and Lyerla to purchase stock in Pennant. All three employees testified that Mr. Evans allowed each of them to purchase stock in lieu of Pennant establishing a retirement plan for its employees. McBride was issued stock certificate No. 6, representing 120 shares. Gualdoni and Lyerla were issued stock certificate Nos. 7 and 8, respectively, both of which represented 80 shares each. At the time of issuance, each share of stock had a value of $100; however, each of the aforementioned employees was allowed to purchase the stock for one-half of the value of the stock.

Because Mr. Evans was concerned that a holder of one of the aforementioned stock certificates could leave the next day and realize a substantial profit on the sale of his stock, paragraphs 6 and 7 were included within the Agreement. They read as follows:

"6. Except as provided in Section 7 of this Agreement, in the event of a sale of stock under Section 3 hereof, or upon the death, retirement, discharge, withdrawal or resignation of any of the above[-]named officers or employees of the Corporation, within a 12-month period commencing on the date as of which all the said attorneys-in-fact above[-]named so unanimously concurred in and signed such a written determination of the net worth of the Corporation, the purchase price to be paid for the purchase and sale pursuant to this Agreement of each share of stock now owned or hereafter acquired by that officer or employee shall be that share's aliquot portion of the net worth of the Corporation as so determined.

7. In the event of the discharge, withdrawal or resignation of any of the above[-]named officers or employees who are now

the owners of Certificates numbered 6, 7 and 8 representing shares of stock of Pennant Supply Company, within a 12-month period commencing on the date as of which all the said attorneys-in-fact above[-]named so unanimously concurred in and signed such a written determination of the net worth of the Corporation, the purchase price to be paid for the purchase and sale pursuant to this Agreement of each share of the above[-]named stock Certificates numbered 6, 7 and 8 now owned by that officer or employee shall be one-half the share's aliquot portion of the net worth of the Corporation as so determined."

In the fall of 1987, McBride returned to school to finish his accounting degree while he was still working for Pennant. Although he never finished the course work for his bachelor's degree, he passed the certified public accountant's competency examination. Because Pennant's business was slow in early 1988, Mr. Evans arranged for McBride to work with Richard Boyd on a "share-time" arrangement.

On March 5, 1988, Pennant's president, Mr. Evans, died unexpectedly. Margaret Evans, his widow, assumed Mr. Evans' position as Pennant's president. Since the company's fiscal year ended the last day of February, McBride requested a meeting with Mrs. Evans on March 19, 1988. In the course of that meeting, Mrs. Evans informed McBride that his services would no longer be needed after May 1, 1988. On March 19, 1988, McBride orally requested that Pennant purchase his stock pursuant to the Agreement.

In the early part of April 1988, McBride received a letter stating that a shareholder's meeting was going to be held on April 23, 1988. The new directors that were elected in that meeting were Margaret Evans, Andrew Evans, and Patricia Evans. The shareholders were told that if they wanted the corporation to redeem their shares of stock, they should formalize their request in writing. That same day, McBride wrote a letter to Pennant's president, Mrs. Evans, requesting that the corporation purchase his stock pursuant to the Agreement. In his letter, McBride stated that he believed that the stock was worth approximately $250 per share, which would make his total amount approximately $30,000. On May 18, 1988, Mrs. Evans responded to McBride's letter. Mrs. Evans denied McBride's request for $250 per share and made a counteroffer to him for $7,500. Mrs. Evans stated that she believed that McBride's original request for $250 per share was in excess of the current fair market value of his stock.

On June 2, 1988, McBride refused Mrs. Evans' counteroffer. In his letter, McBride stated that he had made a determination of the

net worth of the corporation pursuant to the Agreement. According to his calculations, each share of stock was worth $253, for a total amount of $30,360 for McBride's shares of stock.

Lyerla retired from Pennant on October 31, 1990. On November 14, 1990, he requested, in writing, that Pennant purchase his 80 shares of stock. Pennant never responded.

According to paragraph 5 of the Agreement, the officers of the corporation were to annually determine the net worth of the corporation in writing. McBride stated that he and Mr. Evans did this informally on an annual basis; however, he had no access to that information. Paragraph 8 provides, *inter alia*, that if the written annual determination is not accomplished within 30 days after receipt of notice by the corporation of the discharge of that officer or employee, the corporation will have an accountant prepare a statement of the net worth of the corporation. Furthermore, paragraph 8 states that the accountant regularly employed by the corporation at the time of the discharge was to be retained by the corporation to prepare the net worth evaluation. If this accountant was unwilling to perform the evaluation, the corporation could hire a certified public accountant that was acceptable to the corporation.

Because Pennant never had an accountant prepare a net worth evaluation of the corporation, McBride and Lyerla filed a complaint on March 13, 1991, requesting that the circuit court evaluate their stock. They further requested an order for specific performance which would require Pennant to purchase their stock.

On September 19 and 20, 1991, a bench trial was held. At the trial, stock valuation testimony was given by Roland McBride and William Springer, Pennant's new accountant. Richard Boyd refused to do the evaluation because he believed that he had a conflict of interest since McBride had been working for him also. Springer determined that the full value of the stock on March 31, 1988, when McBride was discharged, was $202 per share and on October 31, 1990, when Lyerla retired, the stock was worth $258 per share.

The trial court entered an order stating, *inter alia*, that according to the Agreement, a determination of the net worth of the corporation was to be done within 30 days after receipt of notice by the corporation from the officer or employee that he wished to sell his stock. The circuit court determined that Pennant had breached this provision of the Agreement. The court further found: "No evidence was presented which would allow this court to find that the evaluation completed by Mr. Springer was incorrect, improperly done, or in error in any way."

The court held that because McBride was discharged, the provisions of paragraph 7 applied to McBride, making his stock worth only one-half of its total value. The court accepted Springer's determination of the net worth of the corporation which entitled McBride to $12,106 for his stock. Furthermore, the court determined that since Lyerla had retired, the provisions of paragraph 6 applied to him; therefore, he was entitled to receive the full value of his stock which was $20,700.

Lyerla apparently accepted payment by Pennant as satisfaction for his claim; therefore, Lyerla's claim has been settled and is not the subject of this appeal. McBride, however, filed a notice of appeal on May 18, 1992.

Initially, we note that we do not believe that the circuit court thought that it was required to accept Springer's stock valuation. There is no evidence contained within the amended judgment order which would lead us to such a conclusion. Furthermore, even though McBride presented some evidence that Springer's evaluation was incorrect, it is obvious that the trial judge chose to believe accountant Springer's testimony over McBride's. Because the trial court is in a far better position than the appellate court to assess the credibility of the witnesses in determining the weight to be afforded to their conflicting testimony (*In re Marriage of Eltrevoog* (1982), 92 Ill. 2d 66, 71, 440 N.E.2d 840, 842), we will accept accountant Springer's stock valuation for McBride's stock at $202 per share.

It is clear that on March 19, 1988, McBride orally requested that Pennant purchase his shares of stock. On April 23, 1988, McBride reiterated this request in writing. There is no question that paragraph 4 of the Agreement required Pennant to purchase McBride's stock. Furthermore, there is no question that Pennant breached the Agreement by failing to determine the net worth of the corporation within 30 days after McBride requested that it purchase his stock.

The real question in the case at bar is whether Pennant's breach was material, because if "a party has *materially* breached a contract, he cannot take advantage of terms of the contract which benefit him." (Emphasis added.) (*Robinhorne Construction Corp. v. Snyder* (1969), 113 Ill. App. 2d 288, 297, 251 N.E.2d 641, 645-46, *aff'd* (1970), 47 Ill. 2d 349, 265 N.E.2d 670.) Appellant contends that Pennant cannot rely on paragraph 7, which halves the value of his stock, since Pennant materially breached the Agreement by not determining the net worth of the corporation within 30 days from the date of McBride's request to Pennant to purchase his stock.

In resolving the materiality issue, we must consider the following circumstances:

"(1) whether the breach defeated a bargained-for objective; (2) whether the breach caused disproportionate prejudice to the non-breaching party; (3) whether custom or usage shows the breach to be material; and (4) whether allowance of reciprocal nonperformance would result in an unreasonable and unfair advantage to either party." *Heritage Bank & Trust Co. v. Abdnor* (7th Cir. 1990), 906 F.2d 292, 301.

After carefully weighing the aforementioned factors, we believe that Pennant's breach was material for the following reasons: Pennant did not offer an evaluation of its net worth until September 18, 1991, approximately three years after McBride's initial request to Pennant to purchase his stock. We believe that Pennant's nonperformance was so substantial that the entire object of the Agreement was defeated. The net worth evaluation was the factor that controlled the value of the stock for the purpose of determining its purchase price, which was the primary purpose of the Agreement. Without this evaluation, Pennant could not realistically offer any amount of money for McBride's stock. Hence, the entire Agreement could not be effectuated.

Furthermore, we believe that the breach by Pennant caused disproportionate prejudice to McBride. It is not as if McBride merely went without his money for a few months or even a year. Pennant willfully failed to do an evaluation of the corporation for almost three years even though McBride had indicated that he had certain obligations to meet and that he needed his money. Moreover, we believe that Pennant's actions indicate a lack of good faith and fair dealing on Pennant's behalf. It is clear that Pennant did not intend to give McBride the value of his stock. Furthermore, it is apparent that Pennant thought that it would pay what it wished to pay for the stock instead of performing a proper evaluation of the net worth of the corporation pursuant to the Agreement. We note, however, that "[i]t is commonplace contract law that a party cannot have the benefits of a contract unless he has also performed the obligations." (*Kobus v. Jefferson Ice Co.* (1971), 2 Ill. App. 3d 458, 460, 276 N.E.2d 725, 727.) Therefore, we believe that because Pennant materially breached the Agreement, it cannot rely on paragraph 7 to assert that the value of McBride's stock should be one-half of its full value.

Either the trial judge in the instant case thought that the breach by Pennant was not material and, hence, Pennant was entitled to rely on the terms of the Agreement or the trial judge failed to consider

that if Pennant did materially breach the Agreement it could not take advantage of the terms of the Agreement which benefited it. (See *Robinhorne*, 113 Ill. App. 2d at 297, 251 N.E.2d at 645-46; *Kobus*, 2 Ill. App. 3d at 460, 276 N.E.2d at 727.) Nevertheless, we believe that either interpretation by the trial judge was against the manifest weight of the evidence (see *Skurat v. Kellerman* (1977), 53 Ill. App. 3d 361, 367, 368 N.E.2d 966, 970) for the aforementioned reasons.

In light of the foregoing considerations, we enter judgment pursuant to Supreme Court Rule 366(a)(5) (134 Ill. 2d R. 366(a)(5)) in favor of McBride in the amount of $24,240 based upon Springer's evaluation that the full market value of Pennant's stock on March 31, 1988, was $202 per share.

Affirmed as modified.

GOLDENHERSH and RARICK, JJ., concur.