## Richmond

ROANOKE HOSPITAL ASSOCIATION v. DOYLE
AND RUSSELL, INC., ET AL.

April 28, 1975.

Record No. 740212.

Present, Carrico, Harrison, Cochran, Harman, Poff and Compton, JJ.

*Wilbur L. Hazlegrove (W. A. Dickinson; Hazlegrove, Dickinson, Smith & Rea,* on briefs), for plaintiff in error.

*Lewis T. Booker (Joseph C. Kearfott; Hunton, Williams, Gay & Gibson,* on briefs), for defendants in error.

Poff, J., delivered the opinion of the court.

In 1967, Roanoke Hospital Association (the owner) advertised for bids on construction of a fourteen-story addition to its facilities. Bids were received upon a commitment for completion by January 1, 1970, and upon the condition that a bid could not be withdrawn for 30 days after submission. Bids were opened on July 17, 1967, and on July 27, 1967, the owner entered into an $11 million "lump sum" contract with Doyle & Russell, Inc. (the contractor). Federal Insurance Company was the performance surety.

Before bids were opened, the owner had obtained a loan commitment at $6^{1}/_{4}\%$ interest. When the bids showed that the commitment was insufficient, the owner obtained, on the date the contract was signed, a letter of commitment for a $5.5 million, 15-year loan at $6^{3}/_{8}\%$ interest, contingent upon completion by June 30, 1970. The completion date in the commitment was later changed to October 31, 1970. In addition to the loan, financing arrangements included a $3 million Hill-Burton grant and funds provided by the owner.

Witnesses for the contractor testified that the contractor had no knowledge of the details of the owner's financing arrangements when the contract was executed and acquired none for more than three years. Mr. Flannagan, the hospital administrator, testified that he told the contractor's representatives when the bids were opened "that the building must be completed by the date specified in the contract or else our financial arrangements would have to be redone or rearranged and would cost ... the hospital a higher rate of

interest", but that he told them nothing about the details of the arrangements because he "didn't think it was their business."

For various reasons, including the need to redesign the foundation, *see Doyle & Russell* v. *Roanoke Hospital*, 213 Va. 489, 490-91, 193 S.E.2d 662, 664 (1973), construction progress was delayed, and in October, 1969, the contractor issued a revised progress schedule projecting completion by September 30, 1970. Progress lagged behind the revised schedule, and on January 17, 1970, the architect wrote to the contractor advising it that the lending agency, which had accepted the new projected completion date, had notified the Board of Trustees that it would grant no further extensions of that date.

The letter further said:

"Now the agency states that any delay beyond that date will mean an increase in the interest rate from six and three-eighths to eight and one-half percent. This will mean, throughout the life of the loan, an increased interest cost to the hospital of just under $1,000,000. Needless to say, the Trustees are most concerned; and knowing these gentlemen as I do, I am sure that they will use every legal means at their disposal to see to it that the hospital does not suffer this loss.

"Let me iterate that progress can be upgraded, and please know that we stand ready to do anything in our power to assist in meeting this completion date."

Three days later, the owner, contractor, engineer, and architect held a meeting to devise a plan to expedite progress. Pursuant to the contractor's suggestion, the owner paid some $10,000.00 in overtime wages to assure an adequate force of electricians on the job. Shortly thereafter, the owner paid an additional $6,500.00 to replace certain non-union workers with union members in order to settle a general construction strike.

In April, 1970, the owner, fearing that completion would not be accomplished by the October 31, 1970, deadline fixed in the outstanding loan commitment, obtained from an insurance company two separate options for permanent financing. Both options were set to expire on October 30, 1970.

On June 29, 1970, the contractor wrote to the architect stating in part:

"It is apparent from your letter of June 25, 1970, that you

have misunderstood my letter of June 24, 1970. No reference was made in my letter to the requirements of the contract documents relative to completion, acceptance, and final payment by the Owner. What we are concerned with, insofar as my letter is concerned, is what requirements have to be met to protect the loan commitment which the hospital has for permanent financing. The requirements for the loan commitment and the contract completion and acceptance may be the same, but, if they are, this has never been made clear to us.

"We were given to understand sometime ago that it was very important to the hospital to protect that commitment and that, if this entailed extra ordinary expense, the hospital was willing to stand the extra costs as long as they were kept within prescribed limits. This is what has been done to date, and it has contributed substantially to the overall progress, however, the steps taken to date will not, in our opinion, insure final completion by October 1, 1970.

"To date, the target has been beneficial occupancy of the new building. We believe this is the best we can hope for unless an all-out effort is made. We state again that this calls for two decisions. First, can final completion be achieved by October 1st even with an all-out effort, and, this involves factors over which we have no control, such as the availability of information and the coordination of construction work with hospital activities. Second, if an all-out effort is to be made, it will involve considerable additional costs. The responsibility for this cost must be established. While we will cooperate in every practical way, as we have been doing, which includes making a contribution to extra cost, we do not believe that our contractual responsibility obligates us to accept primary responsibility for it."

In October, 1970, it was apparent that the project would not be completed by the October 31, 1970, loan commitment deadline. The two options for the permanent loan commitments were due to expire on October 30, 1970. The owner decided to exercise the option for a commitment for a $5.5 million, 15-year loan at $8^{1}/_{2}\%$, conditioned upon completion by June 30, 1971.

The hospital addition was ready for occupancy on April 14, 1971, and was completed on September 3, 1971.

In its motion for judgment, the owner sought a total of $3 million in compensatory damages for ". . . Defendant's failure or refusal to complete the work within the time stipulated, or within any requested allowable extension of time for completion . . ." and elected "to recoup the sum of $956,000 held by Plaintiff as retainage". The contractor filed a counterclaim for the retainage.

The evidence showed that the interest expense the owner will incur over the life of the 8½% permanent loan will be $1,185,159.95 greater than the expense it would have incurred over the life of the 6⅜% loan; that the sum of $832,300.00 invested at 5% per annum for the period of the loan would generate funds equal to those additional interest costs; and that 5% was a proper investment factor to be used in computing the return on investment a charitable institution could reasonably expect to earn.

For damages sustained during the period of construction delay, the owner claimed a total of $730,698.00, including $690,287.00 for interest expense incurred and interest revenue lost [1] and $40,411.00 for expenses incurred for utilities, storage costs, and insurance premiums.

The trial court entered final judgment on January 29, 1974, confirming the verdict of a three-man jury.[2] The verdict denied the owner's $832,300.00 claim and allowed the contractor's $956,000.00 counterclaim, with interest from September 3, 1971. On the owner's $730,698.00 claim, the verdict awarded $552,500.00[3], with interest from April 14, 1971. That award included $522,500.00 for what the verdict termed "temporary . . . interest costs" and $30,000.00 for the expenses included in the owner's $40,411.00 claim.

---

[1] The owner's claim included both the interest the owner paid on the loan during the construction period in excess of the interest it would have paid had completion been accomplished timely (*including the excess attributable to increased interest rates*), and the interest it could have earned at 6% per annum during the period of delay on the investment of its own funds and the Hill-Burton funds.

[2] *See* Code § 8-193 (Repl. Vol. 1957) (Now Code § 8-208.21 (5) (Cum. Supp. 1974)). The parties agreed to have the case tried by a three-man jury. The owner and contractor each *selected* one juror and these two selected a third. Under the statute, the decision of two jurors has the same effect as a unanimous jury verdict.

[3] This award represents approximately 76% of the claim. While this may indicate that the jury believed that part of the delay was excusable, the jury's finding that the delay was culpable has not been challenged, and that finding is binding on the parties here.

The questions presented by the owner's assignments of error are:

(1) Whether the owner is entitled to damages for added interest costs for the permanent loan attributable to higher interest rates;

(2) Whether instructions "D" and "E" erroneously induced the jury to disallow the owner's claim for those damages; and,

(3) Whether the trial court erred in awarding the contractor the contract retainage, with interest from the date of completion.

The question presented by the contractor's assignment of cross-error is whether the trial court erred in allowing the owner damages for any added interest costs during the period of unexcused delay. On appeal, the contractor concedes liability for the $30,000.00 award.

■ There are two broad categories of damages *ex contractu*: direct (or general) damages and consequential (or special) damages. *Washington & Old Dominion R.R. Co.* v. *Westinghouse Co.*, 120 Va. 620, 627, 89 S.E. 131, 133 (1916). *See also Sinclair* v. *Hamilton & Dotson*, 164 Va. 203, 209, 178 S.E. 777, 779 (1935). Direct damages are those which arise "naturally" or "ordinarily" from a breach of contract; they are damages which, in the ordinary course of human experience, can be expected to result from a breach. Consequential damages are those which arise from the intervention of "special circumstances" not ordinarily predictable. If damages are determined to be direct, they are compensable. If damages are determined to be consequential, they are compensable only if it is determined that the special circumstances were within the "contemplation" of both contracting parties.[4] Whether damages are direct or consequential is a question of law. Whether special circumstances were within the contemplation of the parties is a question of fact. 5 A. Corbin, *Contracts* § 1012(89) (1964); C. McCormick, *Damages* § 140 (574) (1935).

---

[4] In this context, "contemplation" includes what was actually foreseen and what was reasonably foreseeable. *See* Corbin, *infra* at § 1010 (79):

"If there are special circumstances, it is not even necessary that the defendant should have known them; *it is enough that a reasonable man in his position would have known them.*" [Emphasis added].

*See also* McCormick, *infra* at § 138 (565), commenting upon the rule in *Hadley* v. *Baxendale*. 9 Ex. 341 (1854); *duPont Co.* v. *Universal Moulded Prod.*, 191 Va. 525, 568-69, 62 S.E.2d 233, 253 (1950); *Washington & Old Dominion R.R. Co.* v. *Westinghouse Co.*, 120 Va. 633, 635, 91 S.E. 646, 647 (1917).

As a general rule, contemplation must exist at the time the contract was executed. Corbin, *supra* at § 1008 (74); *Restatement of Contracts* § 330 (1932); 11 S. Williston, *Contracts* § 1357 (293-94) (1968). However, that rule is not absolute. When the breach alleged is an unexcused delay in completion, if the completion date has been altered by consensual amendment, contemplation is to be determined as of the date of amendment.

Here, the damages claimed by the owner involve three types of interest costs: (1) added interest costs (including expenditures on borrowed funds and interest revenue lost on invested funds) during the construction period arising from the longer term of borrowing necessitated by the contractor's unexcused delay (hereafter, "extended financing costs"); (2) added interest costs during the construction period attributable to higher interest rates during the extended term (hereafter, "incremental construction interest costs"); and (3) added interest costs for the permanent loan attributable to higher interest rates (hereafter, "incremental permanent interest costs").

■ The owner argues that all three types of interest costs are direct damages and that instruction "D" [5], insofar as it classified the latter two types as consequential damages, was erroneous. The contractor argues that all three types are consequential damages. We agree with the owner and the trial court that the extended financing costs are direct damages. Customarily, construction contracts, particularly large contracts, require third-party financing. Ordinarily, delay in completion requires an extension of the term of construction financing. The interest costs incurred and the interest revenue lost during such an extended term are predictable results of the delay and are, therefore, compensable direct damages.[6]

---

[5] In pertinent part, instruction "D" read as follows:

"The court instructs the jury that one element of damage for which the Hospital seeks to be compensated is the sum which it contends it has expended for increased interest costs for both construction financing and permanent financing resulting from delay in the completion of the project.

"The court instructs the jury that the claim of the Hospital for damages resulting from increased interest rates is not a direct damage naturally flowing from Doyle and Russell's alleged breach of contract in failure to complete the project on time, but is, instead, a consequential damage."

[6] The measure of direct damages caused by unexcused delay in contract completion is either the rental value of the completed structure for the period of delay, or the reasonable return on the completed structure treated as an investment for the period of delay. Corbin, *supra*, at § 1029 (177-78); *Restatement of Contracts, supra* at § 331 (2). The owner elected to seek the latter. Instead of applying an arbitrary interest rate to total value, the jury adopted the owner's more precise formula and applied the construction loan rate to the loan receipts and an imputed rate to the Hill-Burton funds and the owner's funds invested in the project.

■ We agree with the trial court that the damages resulting from increased interest rates are not direct damages. Increases in interest rates are not caused by delays in completion of construction contracts. Rather, they are caused by variable pressures and counter-pressures affecting supply and demand in the money market. Although interest rates on short-term borrowings are characteristically more volatile than those on long-term borrowings, both are usually unpredictable. For that reason, increases in interest rates are "special circumstances", and damages resulting therefrom are consequential and not compensable unless such circumstances were within the contemplation of the parties. Instruction "D" correctly advised the jury that both incremental construction interest costs and incremental permanent interest costs are consequential damages.

■ Instructions "IV" and "D" told the jury that such consequential damages were compensable if the parties had them in contemplation at the time the contract was executed or when "thereafter amended". The quoted language was inserted by the trial court over the objection of the contractor. We hold that this language was without evidence to support it. Although the record indicates that the parties agreed upon a host of change orders, there is no evidence of a meeting of the minds upon an amendment altering the completion date first fixed in the contract.[7] Consequential damages, then, were compensable only if the "special circumstances" from which they resulted were contemplated by the parties on the date the contract was executed, and there is, therefore, no merit in the owner's complaint that instruction "E" improperly emphasized that date.[8]

■ Although we cannot make a reliable computation from the record, it is clear that some portion of the $522,500.00 award

---

[7] Our holding in *Doyle & Russell* v. *Welch Pile Driving Corp.*, 213 Va. 698, 702, 194 S.E.2d 719, 722 (1973), that change orders issued pursuant to construction contracts were "in the nature of" contract amendments has no relevance here.

[8] On appeal, the contractor appears to argue that the proper date to determine contemplation was the date it submitted its bid, because, as instruction "E" told the jury, the contractor "could not withdraw or otherwise modify its bid for 30 days". We do not agree. If, as Flannagan testified, the contractor was forewarned when the bids were opened that delay "would cost . . . the hospital a higher rate of interest", the contractor could have insisted upon a protective modification of the contract or refused to execute it on the grounds of a material alteration of the terms of the invitation to bid.

represents incremental construction interest costs which, as we have said, are consequential damages.[9] That portion of the award can stand only if the jury made a factual determination that the "special circumstances" from which such damages arose were within the contemplation of the parties. On the other hand, the jury denied the owner any award for incremental permanent interest costs, also consequential damages, and this can only indicate that the jury made a factual determination that the "special circumstances" were *not* within the contemplation of the parties. Since there is nothing in the evidence to justify such contradictory factual determinations, we hold that the verdict is irreconcilably inconsistent and cannot stand.

■ We find no prejudicial error in the judgment awarding the contract retainage, with interest from the date of actual completion, to the contractor. It is true that the contractor did not deliver the release of claims required under clause 28(E) of the contract. However, the time for filing mechanic's liens had expired, *see* Code §§ 43-1 *et seq.* (Repl. Vol. 1970); there is nothing in the record concerning an unsatisfied lien or unsecured claim against the owner; and the performance surety, a party litigant, did not file a counterclaim or a cross-claim. The owner has enjoyed the usufruct of the retainage fund from the date the contractor discharged its contract duties, and any error in awarding the retainage before a formal release was delivered is harmless error.

To the extent that the verdict awarded the owner direct damages and the contractor the contract retainage, the judgment is affirmed. To the extent that the verdict awarded the owner consequential damages for incremental construction interest costs and denied the owner consequential damages for incremental permanent interest costs, the judgment is reversed. The case is remanded for a new trial, and the trial court is directed to instruct the jury to fix the quantum of direct

---

[9] The jury's verdict, signed by the foreman, expressly awarded $522,500.00 in damages for "temporary" interest costs. In response to the foreman's earlier inquiry, the trial court had explained that temporary interest costs included those incurred "during the completion of the job." Manifestly, temporary interest costs as explained by the trial court and reflected in the language of the verdict included what we have denominated as "extended interest costs" *and* "incremental construction interest costs". Indeed, from the evidence adduced in support of the owner's $690,287.00 claim, it was impossible for the jury to separate the two so as to award one and deny the other.

damages; to determine whether, at the time the contract was executed, the parties contemplated "special circumstances" justifying consequential damages; and to award or deny consequential damages accordingly.

*Affirmed in part, reversed in part and remanded.*