139 Ariz. 25 (1983)
676 P.2d 659
ELAR INVESTMENTS, INC., an Arizona corporation, Appellee/Cross-Appellant,
v.
SOUTHWEST CULVERT CO., INC., Syracuse Tank and Manufacturing Co., Inc., Appellants/Cross-Appellees.
No. 2 CA-CIV 4678.
Court of Appeals of Arizona, Division 2.
December 1, 1983.
Rehearing Denied January 6, 1984.
*26 Peter T. Gianas, Tucson, for appellee/cross-appellant.
Snell & Wilmer by George H. Lyons and Arthur T. Anderson, Phoenix, for appellants/cross appellees.
OPINION
BIRDSALL, Judge.
This appeal arises out of a trial to the court without a jury. The court awarded judgment to the plaintiff-appellee Elar in the net amount of $80,993.67 plus attorneys fees and costs. The "net" amount was the result of damages found for breach of contract less the balance due defendants-appellants on the contract. The damages awarded Elar may be characterized as:

 Extended financing charges $41,228.28
 Subcontractor's increased charges 26,554.00
 Extra materials purchased 4,443.73
 Additional labor costs 19,619.00
 __________
 $91,845.01

The appellants contracted to supply the appellee with the necessary prefabricated steel for construction of 15 townhome units constituting Phases III and IV of appellee's development. The total contract price for the steel was $30,926.68.
The appellants contend the judgment for their contract breach should not have included the "extended financing charges" and the subcontractor's increased charges. They do not contest the increased labor and materials items. They further contend they should have recovered on their counterclaim for "extras" in the amount of $6,129.68.
The appellee has cross-appealed for additional damages claimed to result from a "loss on investment" resulting from delay caused by the appellants' multiple breaches. This claim was for $279,528.68.
*27 We affirm the judgment of the trial court as entered.
The record contains evidence supporting the following additional facts, all of which were found by the trial court pursuant to request. See Rule 52(a), Rules of Civil Procedure, 16 A.R.S. The appellee ordered all the steel on March 20, 1979, with delivery to be completed by April 10. Such deliveries as were made did not commence until April 11 and were not completed until October 22, 1979, approximately six and one-half months late. There was no compatible, readily available substitute product. The appellants were promptly informed of deficiencies in materials and delivery and assured the appellee corrections would be made. The appellee continued to use the materials in order to mitigate damages.
Although the appellants do not contest the findings of contract breach, we set forth some of those findings because they are helpful in understanding the total picture. We are mindful of the fact that this damage award is three times the contract price. Although the nature of the breach is irrelevant except as it causes the damage, it explains how the delays arose and probably why the trial court did not find that the appellants were entitled to their claimed extras.
"5. The parties agreed that the Super C. material; joists, rafters, track, lintels and all material for each unit (townhome) was to be delivered to that unit's lot or slab in one bundle per unit for ease of construction and assembly. (emphasis in original)
* * * * * *
7. While Defendants' agent, MITCHELL RECH, assured the Plaintiff that unit delivery would be accomplished, Plaintiff NEVER received any of the steel ordered from the Defendant by the unit (townhome). Delivery was always accomplished by bits and pieces.
8. As a direct result of not delivering the steel in unit bundles, the Plaintiff was forced to move the material all over the project from the time of its delivery until the project was completed or until they needed the materials delivered [e.g., the Defendants delivered joists for virtually all of the units (townhomes) very early in the delivery schedule, and the joists are used last].
9. The Defendants often substituted heavier gauge strapping and material for lighter gauge steel ordered, thereby causing problems with fasteners, strapping, drilling, cutting, and fastening of the steel, as well as attaching dry wall and plywood to the steel.
10. The Defendants delivered steel that was not stamped with the material gauge or its test strength in violation of the ICBO recommendation, and City code.
11. The Defendants delivered, pursuant to contract, screws and fasteners for the material; however, much of the fasteners and screws were improper for the type of material, gauge of material, or the type of fastening that had to be done causing substantial construction problems and in some cases a breakage rate of almost 65%.
12. Plaintiff and Defendants agreed that the tolerances to which the steel would be cut would be + or - 1/8 inch; Defendants' agent, himself, acknowledged that 20% of the material cut in the plan was in excess of that tolerance, and Plaintiff had to re-cut approximately 50% of the material delivered by Defendants because of improper sizing.
13. Defendants failed to deliver sufficient gusset plates used in conjunction with strapping to complete the units  Defendants delivered plates for 5 1/2 units as opposed to the 15 units that were ordered.
14. Defendants delivered door and window lintels not cut to length which Plaintiff had to cut or torch on the job.
15. 1,110 pieces of Super C steel delivered by Defendants to Plaintiff did not fit any place in the project or comply with any of the specifications or cut lists."
The trial court also found that:
"21. The Court finds that it was within the contemplation of the parties that *28 failure of the Defendants to perform the contract and deliver the steel in question per specifications and on time would cause delay to Plaintiff's construction schedule and result in damages."
Other material facts include that two of the 15 units were still unsold at the time of trial, January 1982, and the other 13 were sold at dates much later than August 1, 1979, the date two expert witnesses, an appraiser and a real estate broker, testified they would have been sold except for the delay. However, the court, in denying the appellee's claim for "loss of investment," found that:
"... after the 6 1/2 month delay the failure to sell Eastern Heights Village Townhomes and consequential loss of income to Plaintiff was caused by the sudden and unanticipated drastic rise in interest rates rather than by Defendants' breach; and the Court specifically finds that rise in interest rates and its effect on the market was not within the contemplation of the parties at the time they entered into the contract." [Findings number 23]
The appellant contends that the evidence does not show the "extended financing charges" were within the contemplation of the parties. Since this case involves the sale of goods, it comes under the UCC-A.R.S. § 44-2301, et seq. The provisions of particular importance are:
"§ 44-2393. Buyer's damages for breach in regard to accepted goods
A. Where the buyer has accepted goods and given notification (subsection C of § 44-2370) he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable."
"§ 44-2394. Buyer's incidental and consequential damages
A. Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.
B. Consequential damages resulting from the seller's breach include:
1. Any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; ..."
The extended financing charges were found to be direct damages resulting from the breach. It is necessary to understand how the court arrived at this amount  i.e., what it represents. The court found that the appellee had interest expense from August 1, 1979 (the date when all the units would have been sold) through December 31, 1981, of $199,270. Dividing this figure by the 29 months covered, produced monthly interest of $6,871.38, which was then found to be the monthly interest cost to the appellee for the period of the delay. Using this monthly figure for six months produces the $41,228.28 included in the judgment.
That reasoning and that calculation is supported by the evidence. We also agree with the court's conclusion that this element of damage was direct. The decision in Roanoke Hospital Association v. Doyle & Russell, Inc., 215 Va. 796, 214 S.E.2d 155 (1975), is in point. There the court said:
"We agree with the owner and the trial court that the extended financing costs are direct damages. Customarily, construction contracts, particularly large contracts, require third-party financing. Ordinarily, delay in completion requires an extension of the term of construction financing. The interest costs incurred and the interest revenue lost during such an extended term are predictable results of the delay and are, therefore, compensable direct damages. 214 S.E.2d at 160-61.
*29 See also, Annotation in 96 A.L.R.3d 299, "Buyer's Incidental and Consequential Damages from Seller's Breach under U.C.C. § 2-715." The appellants knew the townhomes were being constructed for resale; it is reasonable to infer they knew the approximate total sales price involved  some $900,000; they knew the importance of their product in the construction; they were repeatedly advised of the problems encountered in their performance; they had promised delivery in three weeks. The trial court's findings and conclusions pertaining to those charges are supported by the law and evidence. The Arizona authority cited by the appellant is inapposite. None of the cases involve the sale of goods under the U.C.C. See All American School Supply Co. v. Slavens, 125 Ariz. 231, 609 P.2d 46 (1980); Valley National Bank v. Brown, 110 Ariz. 260, 517 P.2d 1256 (1974); Southern Arizona School for Boys, Inc. v. Chery, 119 Ariz. 277, 580 P.2d 738 (App. 1978). Likewise, Distco Laminating, Inc. v. Union Tool Corp., 81 Mich. App. 612, 613, 265 N.W.2d 768 (1978), is distinguishable since it involves rescission and the court's refusal to grant judgment notwithstanding a jury verdict which did not award the buyer interest on the money borrowed to purchase the subject merchandise. Assuming, arguendo, the question is one of fact, the trial court in the instant case was the trier of fact and made a contrary finding.
We note further that even if the extended financing charge is considered to be "incidental" damage for delay under A.R.S. § 44-2394(A), the contemplation test is not controlling. That damages for delay can be recoverable as incidental damage, see District Concrete Co., Inc. v. Bernstein Concrete Corp., 418 A.2d 1030 (D.C.C.A. 1980).
Finally, in this regard, the trial court found as a fact that damage for delay was within the contemplation of the parties. We must accept that finding since it is not clearly erroneous. Rule 52(a).
The increased charges of subcontractors was also caused by the delay. What we have said concerning delay being within the contemplation of the parties also applies to this item of damage. However, the appellants contend the proof of this item was insufficient. Their argument focuses on an exhibit they claim should not have been admitted. The exhibit consisted of several separate documents under one cover sheet. The documents included invoices for subcontractors for phases III and IV and letters from some of them stating that their increased charges over phase II were due only to delay. The cover sheet was a compilation of charges made by nine of the subcontractors for phases II, III and IV showing the total of the increase to be $24,647. The exhibit also contained original documents or copies thereof showing charges of $1,907 for renewals of building permits.
The appellee's principal officer testified, without any objection, to the following foundation for the admission of the exhibit: That if the project had been completed as scheduled the subcontractors' prices would have held as quoted, but because of the delay the contractors had to and did pass on their costs; that the compilation showed the increased costs and was extracted from the appellee's books and records and from the subcontracts; and that it was necessary to get the new permits because the others expired. Then, still without objection, and before the exhibit was even offered, the witness testified to the dollar amounts of the items, including the total found by the court, $26,554.
There was no motion to strike any of this testimony. With that evidence in the record the exhibit was unnecessary and any error in its admission was harmless. We see no need for further discussion of the appellant's contentions concerning this matter.
The next error argued by the appellants concerns the method of calculating the amount of damage arising from the extended financing charges. The appellants argue that the trial court awarded six months' interest based on the anticipated delivery date (April 10) and the actual last *30 day of delivery (October 22). This is either incorrect or an oversimplication. While it is true that the court found the last steel delivery was approximately six and one-half months after the last steel should have been delivered, the court did not find that the construction delay ended with that last delivery. Nor would the evidence support such a finding. Construction continued beyond that date. Except for appellants' breaches, the units would not only have been completed but would have been sold by August 1. Since no evidence showed the exact length of time the project was delayed by appellants' performance the trial court chose the length of time between the contracted delivery and actual delivery dates. The reason no evidence showed the exact delay time was because of the new problem encountered  the high interest rates and poor real estate market. The use of the six months as the length of the delay was an approximation. The computation of the amount of damages which are not fixed is a matter within the discretion of the trial court  a factual determination  and unless clearly erroneous, will not be reversed on appeal. Fernandez v. Union Acceptance Corp., 125 Ariz. 459, 610 P.2d 461 (App. 1980); Costanzo v. Stewart Title & Trust of Phoenix, 23 Ariz. App. 313, 533 P.2d 73 (1975). This is not a case in which the evidence of the amount of damage is speculative or remote or weak. See Gilmore v. Cohen, 95 Ariz. 34, 386 P.2d 81 (1963). The witnesses produced were most knowledgeable (the broker, the appraiser and a certified public accountant) and most of the evidence was admitted without objection, some by stipulation.
The appellant's argument assumes only delivery dates were considered in arriving at a six months' delay. The evidence demonstrated that other breaches of the appellants caused delay. For example, due to the appellants' failure to correctly mark the steel, the city inspectors stopped the construction on two occasions; some of the steel had to be recut; materials which should have come in bundled units, one for each townhome, had to be sorted and moved; some steel was never delivered and some was obtained from other sources. In addition, crews hired to frame the units were delayed, as were other subcontractors, and completion of units could not be promised to prospective purchasers. The trial court measured these damages "with as much mathematical precision as the nature of the claim and the available evidence could provide." Hercules Drayage Co., Inc. v. Chanco Leasing Corporation, 24 Ariz. App. 598, 540 P.2d 724 (App. 1975) (concerning loss of profits).
Although the extended financing resulted from delay in selling the units, we do not agree with the appellants that the original construction schedule should have controlled the court's calculation. The trial court explained its reasoning in conclusions of law as:
"4. The Court further concludes that the damages for delay in this case could be calculated in any of three ways:
A. Additional interest cost to the Plaintiff for the period of the delay; or
B. The reasonable rental value of the townhomes lost because of the delay; or
C. A reasonable rate or (sic, of) return on Plaintiff's investment as a result of the delay.
5. The Court concludes as a matter of law that the additional interest expenses actually incurred by Plaintiff for the period of the 6 + month delay in receiving all of the materials, as caused by the Defendants, are direct damages and are, therefore, recoverable as opposed to damages which are based on loss of interest income on Plaintiff's investment over the protracted period Plaintiff had to hold the townhomes as a result of `missing the market,' which are consequential damages and are, therefore, not recoverable as not being within the contemplation of the parties."
We turn now to the appellants' final contention that they should have recovered for the materials they claim were extras, over and above the contract. We must dispose of this claim by observing that there was a conflict in the evidence. The *31 appellants' proof would support their claim but the appellee's proof is in direct conflict. The appellee contends the claimed extras were delivered to replace steel which did not satisfy the specifications. The court believed the latter explanation. We are bound by that factual determination.
Finally, the appellee cross-appeals, "sheepishly", for his "loss of investment." Since the appellee had not sold the units when the real estate market soured, all due to the delay caused by the appellants, the appellee would have the appellants made liable for this damage. The trial court found this was not within the contemplation of the parties. A.R.S. § 44-2394(B)(1). That conclusion has ample support in the record. The trial court properly denied any recovery for consequential damages on that theory.
Affirmed.
HOWARD, C.J., and HATHAWAY, J., concur.