NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

E&M SERVICES, LLC, *Plaintiff/Appellee,*

v.

A&N SERVICES, LLC, et al., *Defendants/Appellants*.

No. 1 CA-CV 18-0616
FILED 3-3-2020

Appeal from the Superior Court in Maricopa County
No. CV 2016-013511
The Honorable Roger E. Brodman, Judge

**AFFIRMED**

COUNSEL

Whitley Legal Group, PC, Scottsdale
By Jeffrey C. Whitley
*Co-Counsel for Defendants/Appellants*

Dorsey & Whitney, LLP, Minneapolis, MN
By F. Matthew Ralph
*Co-Counsel for Defendants/Appellants*

Donald J. Newman, PC, Phoenix
By Donald J. Newman
*Co-Counsel for Plaintiff/Appellee*

Lane & Nach, PC, Phoenix
By S. Gregory Jones
*Co-Counsel for Plaintiff/Appellee*

---

**MEMORANDUM DECISION**

Judge Jennifer B. Campbell delivered the decision of the Court, in which Presiding Judge Maria Elena Cruz and Judge Kent E. Cattani joined.

---

**C A M P B E L L**, Judge:

**¶1**        This matter involves competing claims of breach of contract, breach of the duty of good faith and fair dealing, and fraud. Following a four-day bench trial, the superior court found in favor of Eslam Hawari and his related business entities, E&M Services, LLC; Sahnad Services, LLC ("Sahnad"); and M&T, LLC (collectively, "E&M"), on all of its claims against A&N Services, LLC, Abedelhalim Lawabni ("Abed"), and Nohad Loabneh ("Ned") (collectively, "A&N").[1]

**¶2**        The superior court's judgment hinged on its determination of the witnesses' credibility. The court, in a detailed 13-page minute entry, stated that the parties' versions of events were mutually exclusive and explicitly found Eslam to be the more credible party.

**¶3**        A&N appeals the various findings of fact and conclusions of law in favor of E&M and the award of attorney fees below.[2] Finding no error, we affirm.

---

[1]        The superior court found in favor of A&N on its counterclaim which alleged that E&M provided false trip reports with forged signatures.
[2]        Although A&N generally challenges Eslam's credibility, it does not specifically dispute the following five damage claims:
  (1) The payout withheld for rides from July 11, 2016, to October 2, 2016: $86,412.79.

**BACKGROUND**

¶4          Over the past 30 years, brothers Abed and Ned have operated several businesses in Minnesota and Arizona, including A&N, which operates primarily as a government contractor. At A&N, Ned was primarily responsible for A&N's contracts, claims, and subcontractors, and Abed was primarily responsible for accounting functions.

¶5          Eslam had previously worked for Ned and Abed in Minnesota as an employee and subcontractor with their first non-emergency medical transportation business. Eslam moved to Arizona, formed E&M, and became a subcontractor of A&N.

¶6          The parties have had long-standing personal relationships. Both Eslam and Ned testified the other was like family. They vacationed together, and their wives were friends. Abed did not like Eslam, but Ned persuaded Abed to let Eslam do business with A&N. Ned and his various companies loaned Eslam and E&M money based on several verbal agreements; the repayment of these loans underlies some of the issues in this case.

¶7          A&N contracted to provide non-emergency medical transportation services to government agencies, particularly the Arizona Health Care Cost Containment System ("AHCCCS"), and several prime contractor transportation companies. A&N furnished administrative services to subcontractors who provided the actual transportation for the patients.

¶8          A&N paid its subcontractors between 70–80 percent of gross billings. A&N issued payment on a biweekly basis for rides performed during the prior two weeks. Prior to payment, A&N sent "payout" reports to subcontractors listing revenues paid out for rides and any deductions.

---

(2) The erroneous recoupment for a ride provided by another subcontractor: $717.84.
(3) The overassessment for chargebacks stemming from the Office of Inspector General's audit: $1,866.27.
(4) The missing rides from 2015-2016: $74,987.25.
(5) The underpayment for 2014: $64,776.51.

Ned calculated the maximum amount E&M was entitled to per its allegations was $24,891.66 (before offsets due to E&M's alleged material breach). A&N argued it did not deliberately or knowingly underpay E&M and any underpayment was excused by E&M's breach.

Deductions included administrative expenses, such as rent, marketing materials, copying costs, electronic deposit fees, and "recoupment" for claims denied by reimbursing entities.[3] A&N also sent its subcontractors "aging reports" to account for "out of order" rides, or rides performed in prior periods that had been entered into A&N's billing system after the cutoff time for their corresponding billing cycle.[4]

¶9        While A&N's main customer, AHCCCS, quickly reimbursed claims for most rides, it occasionally denied a claim because of incomplete paperwork or a failure to get a prior authorization for rides in excess of 100 miles. A&N was able to review AHCCCS' online portal to check the status of each claim. A&N had up to six months from the date of service to submit or supplement claims for reimbursement.

¶10       E&M was A&N's largest subcontractor between 2013 and 2016, performing more than 47,000 rides.[5] E&M had a fleet of approximately 40 vehicles and hired its own drivers. The drivers provided trip logs to document the trips, and each individual trip was listed in A&N's online portal. A&N paid E&M in excess of $2.2 million dollars over the course of their business relationship.

¶11       It is undisputed that in December 2013, MEISA Transportation Services, LLC—another non-emergency medical transportation business owned and operated by Ned and Abed—loaned Eslam $40,000 to establish the Arizona business. This was a verbal contract

---

[3]        During his testimony, Abed used Exhibit 187, the December 2013 file for A&N's subcontractor, M&T, as a payout exemplar. That document shows the total amount invoiced to the contracting entity, minus drivers' wages (which A&N paid at that time along with workers' compensation), minus "other applicable deductions" for direct deposit fees, the monthly fee for use of A&N's online portal, copier fees, two vehicle decals, and denied claims for that time frame. The remainder, in item four, was the net amount of payout due to M&T. Notably, this exhibit was drawn up for trial.

[4]        Prior to 2015, A&N used an end-of-year reconciliation rather than biweekly aging reports to account for out-of-order rides.

[5]        E&M also served as the sole member of Sahnad, which was managed by Eslam and also provided transport services to A&N under the same contractual terms as E&M.

without contemporaneous paperwork, nor subsequent payment receipts or accountings.[6]

¶12      Eslam noticed inconsistent billing entries and discussed the issue with Ned both in person and over email. Initially, Ned said he would look into it but later attempted to resolve the issue by falsifying payout records.[7]

¶13      Eslam and Ned argued, and Ned eventually told Eslam he wasn't going to change his position. Upset that such a large error was going uncorrected, Eslam began reviewing old payouts looking for other errors. Around this time, Eslam received a tip from Husam Alsadi, a disgruntled former subcontractor, that he should look for errors in A&N's 2014 payouts. After investigating the payouts, Eslam determined that A&N had shorted him for 1,388 rides.

¶14      Also in June 2016, A&N received a notice from the Office of Inspector General ("OIG") that a preliminary investigation determined AHCCCS had overpaid A&N by $7,265.37. The issue related to transportation claims where there was not a concurrent AHCCCS-covered medical service claim, which raised red flags. In July, Abed sent Eslam a copy of the letter and advised him he was going to withhold Eslam's current payout until A&N could determine how much recoupment E&M owed for the rides it had performed. A few days later, Ned sent an email to Eslam informing him that A&N would be recouping $3,951.46 from E&M's next payout, claiming that E&M had provided 33 of the rides at issue. After checking his own pay out records and A&N's online portal, Eslam determined E&M had provided approximately half of the challenged rides, but A&N refused to adjust the recoupment.[8]

¶15      The parties' relationship quickly deteriorated. In August, Ned advised Eslam he was conducting an audit of E&M for fraud, waste, and abuse. Ned demanded that E&M produce all missing original trip logs for thousands of trips dating back to 2014 within five days. Because Ned did

---

[6]      At issue, in part, is whether A&N made additional loans to Eslam, and whether all the loans were paid back.

[7]      It was later determined that E&M was penalized for another subcontractor's mistake.

[8]      Eslam suspected that A&N had copied and altered records from the subcontractor who actually performed the rides, I&M, to make it appear as if E&M had provided the rides.

not specify which of the 47,000 trips were missing trip logs, however, Eslam was unable to produce them. Citing this failure, A&N suspended E&M on August 22, 2016. A&N, rather than processing the then-due payout of $86,412.79 due to E&M, withheld it. Eslam immediately went to work for a competitor of A&N.

¶16 After being unable to informally resolve the conflicts with A&N, E&M filed a complaint in superior court alleging several counts of breach of contract, breach of the duty of good faith and fair dealing, and fraud. E&M alleged damages stemming from A&N's failure to pay for certain "missing rides," failure to pay for services E&M provided in July and August of 2016, overassessment of chargebacks from the OIG audit, and erroneous recoupment assessed for rides provided by other subcontractors.[9] Eslam further asserted that he had been systematically underpaid in 2014 and that A&N had doctored payout reports.

¶17 A&N filed an answer and counterclaimed for breach of contract and unjust enrichment. A&N later amended its answer and counterclaims. In the joint pretrial statement, A&N asserted E&M had breached its subcontract by providing meals and other prohibited kickbacks to riders, by submitting fraudulent trip logs, by going to work for a competitor in violation of the covenant not to compete, and by copying the A&N contract to create a contract with the competitor. A&N also asserted that E&M had failed to pay back various loans. The joint pretrial statement also contained some stipulated facts, which the superior court adopted.

¶18 Eslam, Ned, and Abed each testified during the four-day bench trial. Four additional subcontractors or former subcontractor drivers also testified: Bruce Yazzie, Adel Alfaraneh, Sadi Alsadi, and Husam Alsadi. The superior court reviewed deposition testimony from three additional witnesses, including Eslam's wife Renieh Alratrout. No financial experts testified. Over 100 items were admitted into evidence.

¶19 In reaching its judgment, the superior court stated:

> This case is about credibility. The parties tell such dramatically different versions that their stories cannot be reconciled. In other words, unlike some cases, disputes

---

[9] "Missing rides" is the term the parties use for AHCCCS rides provided by E&M and paid for by AHCCCS to A&N, but where E&M never received its due share.

cannot be attributed to good faith misunderstandings of events. Someone is lying.

The [c]ourt finds that the version of the facts given by Eslam is more credible than the version given by Ned and Abed.

¶20 The superior court awarded E&M a total of $225,081.26 in damages for breach of contract and $64,776.51 for fraud. The court awarded Sahnad $3,336 for breach of contract and $3,336 for fraud. The court made Abed and Ned jointly and severally liable for the fraud damages, while also indicating that because the fraud damages for both companies were duplicative to the contract damages, they were not separately recoverable. The court awarded E&M $213,163.75 in attorney fees and $9,730.45 in taxable costs.

¶21 A&N filed a motion for reconsideration which the superior court denied. A&N filed a timely notice of appeal. The court also denied A&N's untimely motion to amend the findings of fact and conclusion of law. The matter was temporarily stayed in this court pending the superior court's signing of two unsigned orders and resolution of a claim for post-judgment attorney fees against A&N. A&N timely filed an amended notice of appeal.

¶22 On appeal A&N asserts:

1. The court's credibility findings in favor of Eslam and against A&N were clearly erroneous in material respects;

2. The court erred by denying A&N's counterclaims related to loans made to E&M;

3. The court erred by determining A&N's three-year covenant not to compete was unenforceable and by declining to adopt factual findings in support of that claim;

4. The court erred when it denied A&N a remedy for E&M's alleged Medicaid fraud;

5. The court's bad faith and fraud findings as to A&N are erroneous; and

6. The attorney fee awards below should be reversed.

## DISCUSSION

### I.    Standard of Review

**¶23**         On appeal from a bench trial, we review questions of law de novo but review the superior court's findings of fact for clear error. *Castro v. Ballesteros-Suarez*, 222 Ariz. 48, 51–52, ¶¶ 11–12 (App. 2009). Even if substantial conflicting evidence exists, "[a] finding of fact is not clearly erroneous if substantial evidence supports it." *Kocher v. Dep't of Rev. of Ariz.*, 206 Ariz. 480, 482, ¶ 9 (App. 2003). Evidence is substantial if "a reasonable person [could] reach the trial court's result." *Davis v. Zlatos*, 211 Ariz. 519, 523–24, ¶ 18 (App. 2005) (quoting *In re U.S. Currency in the Amount of $26,980.00*, 199 Ariz. 291, 295, ¶ 9 (App. 2000)). "We view the evidence and reasonable inferences from that evidence in the light most favorable to the prevailing party." *FL Receivables Trust 2002-A v. Ariz. Mills, L.L.C.*, 230 Ariz. 160, 166, ¶ 24 (App. 2012).

### II.    Credibility

**¶24**         Since neither party kept written documentation regarding the existence or repayment of loans or potential offsets, witness credibility drove the result in this matter. In deciding which party to believe about the loans made, loans paid, and which parties were complicit in potentially fraudulent behavior, the superior court found Eslam the more credible witness.

**¶25**         A&N argues the superior court's credibility findings are "clearly erroneous" and not supported by the record. A&N asserts, among other things, that: (l) the court's interpretation of the events surrounding a pre-deposition visit between Abed, Ned, and former A&N subcontractor Husam Alsadi was "coincidental" and given undue weight; (2) Eslam's misdeeds occurred over a longer period of time than any misdeeds Ned may have engaged in; (3) the court made unwarranted findings of A&N's wrongdoing outside the scope of the case;  and (4) the court "gave no weight to [A&N's] credible and . . . disinterested witnesses," and "undue weight" to Husam Alsadi's testimony. We disagree.

**¶26**         After hearing several days of testimony, the superior court stated:

> Although there are multiple reasons to find plaintiff's version of the story more credible . . . the [c]ourt puts emphasis on the events surrounding Husam Alsadi's deposition. Everyone agrees that Husam Alsadi was scheduled to have his

deposition taken on the afternoon of October 3, 2017. On the morning of the deposition, Ned and Abed visited Mr. Alsadi at his place of work. There was no credible evidence that Ned and Abed regularly stopped by Mr. Alsadi's gas station just to chat. Mr. Alsadi credibly testified that Ned and Abed asked him not to testify about loans being repaid in cash.

Ned and Abed denied that they were trying to influence Mr. Alsadi's testimony. Ned flatly denied having a conversation with Mr. Alsadi about the deposition. The [c]ourt finds Ned and Abed not credible on this point for several reasons. First, Mr. Alsadi's testimony is credible. Overall, he was a credible witness. A review of his deposition testimony presented during trial reveals that Mr. Alsadi was earnestly trying to avoid testifying about loan repayments in cash while responding to Mr. Newman's questions during the deposition. Defendants' counsel pressed him on the point and Mr. Alsadi reluctantly acknowledged that he regularly repaid loans to Ned and Abed by cash. Second, Ned's explanation for showing up at Mr. Alsadi's business on the morning of the deposition was not credible. It was not a coincidence that Ned and Abed just happened to stop by on the morning in question. The [c]ourt finds that Ned and Abed went to Husam Alsadi to pressure Husam Alsadi into giving inaccurate testimony. Such conduct will not be rewarded.

¶27        On the issue of the relative misdeeds of both parties, the superior court stated:

While A&N committed misconduct, E&M is not without fault. Although not as extensive as A&N's misconduct, E&M breached the [subcontractor] contract and engaged in a number of improper activities, including providing A&N with fraudulent trip logs and improperly buying meals for riders. E&M's improper conduct goes back to Minnesota, where Eslam's wife submitted false trip logs for drives she did not make.

Moreover, E&M took out undocumented loans and repaid them in cash. Although E&M didn't benefit from this practice as much as A&N did, E&M knew exactly what was going on and was complicit in the scheme.

The superior court was obviously aware of Eslam's misdeeds and, nevertheless, concluded that he was the more credible of the parties.

**¶28** We acknowledge that conflicting testimony was presented. As our Supreme Court has noted, "where there is a dispute in the evidence from which reasonable [persons] could arrive at different conclusions as to the ultimate facts, we will not disturb the findings of a trial court." *In re $26,980.00*, 199 Ariz. at 296, ¶ 16 (citations omitted).

**¶29** A&N asserts that the superior court gave no weight to two of their credible and disinterested witnesses. But those witnesses were not necessarily disinterested, given their financial relationships with A&N. Moreover, even assuming the court gave no weight to the witnesses' testimony, there would be no error. A finder of fact "may accept everything a witness says or part of it or none of it." *Callender v. Transpacific Hotel Corp.*, 179 Ariz. 557, 562 (App. 1993). Our Supreme Court has long held that a finder of fact is not bound to accept even the uncontroverted testimony of any witness, and especially that of interested witnesses. *See, e.g., Estate of Reinen v. N. Ariz. Orthopedics, Ltd.*, 198 Ariz. 283, 287, ¶ 12 (2000). Accordingly, we decline to reverse the court's credibility determinations.

## III.   Loans

**¶30** A&N asserts that the superior court failed to require any "affirmative" or documentary evidence from Eslam that he ever repaid the loans. We disagree.

**¶31** In an action for breach of contract, the plaintiff bears the burden to prove the contract was breached and damages resulted. *Thomas v. Montelucia Villas, LLC*, 232 Ariz. 92, 96, ¶ 16 (2013). Whether a contract has been breached is generally a question for the finder of fact. *Great Western Bank v. LJC Development, LLC*, 238 Ariz. 470, 478, ¶ 23 (App. 2015) (construction loans). The superior court's factual findings will be "accepted on appeal unless they are clearly erroneous." *Davis*, 211 Ariz. at 523, ¶ 18.

**¶32** The parties stipulated that E&M received three loans. Finding Eslam's version of events more credible, the superior court found that Eslam had repaid all of the loans, albeit in cash.

**¶33** The superior court detailed the mutually exclusive nature of the conflict:

> Of course, none of these loans are reflected by a promissory note or other written agreement.

Eslam claims he has repaid all loans in full. A&N claims that Eslam has not paid a dime on any of the loans.

¶34        Eslam's testimony was supported directly and indirectly by other witnesses and exhibits. Eslam testified, as did Husam Alsadi, that loans from A&N were buried in payouts, disbursed in odd numbers in order to avoid scrutiny by government officials, and made to look like expenses. Eslam testified:

Q So do you know why Ned and Abed disguised their loan as a payment for an invoice to you?

A [Eslam] Well, first of all, they put it in a 1099, so if they get audited, you know, it says invoice for UCare, but it's not UCare. I mean it's, by their own admission, it's a loan.

Q Right.

A And it says here [in Exhibit] UCare payment, and even though I received, you know, prior to that, the direct pay for [a] similar period, I mean we both know that was not a loan. And . . . they decide to put a note there that's for maybe the IRS or for any audit that . . . comes up that will show that this was a work-related [expense], not loan.

Q So it looks like an expense [for A&N] when it's on their bank account going out, and then when it's paid back there's no sign of it if it's cash.

A Yeah. And . . . there [are] no traces of it, it's cash.

¶35        On cross-examination, A&N questioned Eslam about why his bank accounts did not then reflect regular cash withdrawals for loan payments.  Eslam testified that he usually used cash that he had on hand, but when he did not have cash available, he would disguise the "memo" on a check or bank withdrawal slip as being for the purchase of a car.

¶36        Husam Alsadi stated that he, like Eslam, had taken loans from A&N. He testified that Abed had told him to avoid round numbers  that might draw attention. Both of his loan disbursements were buried in payout documents. Alsadi testified he personally delivered loan repayments of $5,000 in cash during the first three days of each month.  He testified that those payments are not reflected in his bank statements because he paid in cash. Eslam likewise testified that he once ran into

Husam at the A&N offices at the beginning of the month; each of them had envelopes full of cash to make their loan payments and made a joke about it being "payday" for A&N.

¶37        Eslam's and Alsadi's trial statements were likewise supported, indirectly, by Abed. Abed admitted that Eslam's payment in December 2013 for $40,000 was written so as to appear to be a payout to Eslam's former company M&T, although he admits it was not. Abed stated that Eslam asked him to do that.

¶38        Ned denied the existence of one of the loans and maintained the large payment was a reconciliation payment. Regarding the other two loans, Ned stated he didn't insist on repayment from Eslam because A&N needed E&M to help take on new contracts and because the outstanding loans paled in comparison to anticipated revenues. He denied requesting or receiving loan repayments in cash.

¶39        The superior court summarized its conclusions:

> In areas such as loans and loan repayments, the lack of supporting documentation is surprising. There are no written promissory notes, repayment schedules, or receipts for payments. (Eslam testified he needed to make all repayments in cash.) Although some of the lack of documentation may be explained because of the long-standing relationship between the parties. (Eslam and Ned both testified that they considered the other like family), the [c]ourt was persuaded that a significant portion of the lack of documentation was an effort to avoid appropriate accounting.

> . . .

> The [c]ourt finds that the version of the facts given by Eslam is more credible than the version given by Ned and Abed.

> . . .

> Defendants had the burden of proving that there was a loan contract, that Eslam breached the contract, and that the breach resulted in damages. Defendants failed to prove that they have been damaged by Eslam's breach of the loan agreements.

> In conclusion, the [c]ourt finds that A&N made loans to Eslam and his companies in the following amounts: 1) $40,000 in December 2013; 2) $40,000 in August 2014; 3) $70,000 in December 2014; and 4) $20,000 in December 2014 to Sahnad. The [c]ourt finds that all of these loans were repaid by Eslam in cash.

¶40 Because the record supports the superior court's findings, we affirm the court's judgment as to the loans.

## IV. Covenant Not to Compete

¶41 A&N challenges the superior court's denial of its counterclaim that E&M breached its subcontracting agreement by, among other things, going to work for a competitor of A&N one day after A&N "suspended" E&M in August of 2016. E&M entered into a series of four successive independent contractor agreements with A&N. Each contract contained a covenant not to compete with no geographical limitation.

¶42 The superior court expressed "concerns about the enforceability of the noncompete provision," noting that a "three year noncompete is too long" under Arizona precedent. Regardless of the enforceability, however, the court held that any breach of the noncompete by E&M was excused by material breaches of the implied covenant of good faith and fair dealing by A&N. Alternatively, assuming the noncompete was enforceable and breached, the court found A&N had failed to prove damages.

¶43 A&N contends that the superior court erred by questioning the covenant's enforceability, arguing that non-compete provisions that are effective during the term of the contract are "inherently reasonable" because businesses are entitled to protect their interests from competition by independent contractors they work with. A&N asserts the contract was still in effect when Eslam pursed a new business relationship, which would have allegedly breached the non-compete provision. However, the court found A&N's "suspension" of Eslam was pretextual and Eslam's contract had, in fact, been terminated, which rendered the non-compete covenant invalid. A&N therefore failed to advance a legitimate protectable business interest and we affirm the court's finding to that effect. *See Hilb, Rogal & Hamilton Co. v. McKinney*, 190 Ariz. 213, 216 (App. 1997). A material breach by one party excuses performance by the other party to the contract. *Zancanaro v. Cross*, 85 Ariz. 394, 399 (1959).

¶44        A&N also contends it presented sufficient evidence of lost profits to substantiate its damage claim. E&M counters that A&N was the first to materially breach the contract, relieving it from its non-compete obligation. A&N also makes various claims regarding factual findings related to this claim, including its asserted lost profits of nearly $400,000. Having affirmed the superior court's finding that Eslam's conduct in seeking new employment following A&N's breach was justified, we need not address those claims.

## V.        E&M's Alleged Medicaid Fraud

¶45        A&N asserts that E&M breached its subcontractor agreement by submitting fraudulent trip logs and providing meals as incentives to patients in violation of the contract, the A&N Policies and Procedures Manual, and AHCCCS regulations.

### A.        Forged Trip Logs

¶46        After Eslam left A&N, Ned began a quality-control investigation of E&M and questioned several of Eslam's trip logs. The superior court heard from Bruce Yazzie, a former driver for E&M, that someone had submitted his forged signature for eight different rides occurring after he had left the company's employment in June 2016.

¶47        Eslam testified he had given some trip logs to other Navajo drivers to get Yazzie's signature, but he didn't verify the signatures himself. He stated that the handwriting appeared to be Abed's. Eslam admitted that there were four rides for which Bruce Yazzie's name was improperly used.

¶48        Eslam testified that he did not find out about the forgeries until they were in litigation, but the superior court may not have found him completely credible. As A&N has continually reminded the court, Eslam and his wife submitted "hundreds" of claims for rides she did not provide when they were working in Minnesota. Eslam admitted he forged her signature on some of the claimed rides.[10]

¶49        The Yazzie rides at issue totaled 1,921 miles and would have resulted in $3,679.40 for E&M. Although the OIG never challenged the accuracy of the trip logs, the superior court found E&M's submission of

---

[10]        Eslam indicated that Ned showed him how doing so would result in more money. Eslam's wife testified that due to their close relationship, Ned certainly knew that she couldn't drive.

those claims to be a breach of contract and held any recovery by E&M would be offset by $3,679.40.

¶50        A&N next asserted Eslam breached the contract by failing to submit original trip logs during the quality control audit. The superior court found AHCCCS did not require the submission of original trip logs and A&N had never previously required the originals. Because the request for original logs wasn't pursuant to an audit by AHCCCS, A&N did not suffer any financial loss. Finding evidence in the record to support these findings, we affirm.

## B.        Providing Meal Incentives

¶51         A&N also asserted E&M violated the subcontractor agreement and committed fraud by allowing drivers to provide meals to passengers contrary to AHCCCS guidelines on fraud, waste, and abuse. AHCCCS rules prohibit a driver from buying meals for its passengers. Section 4(b) of the contract between A&N and E&M required E&M to conform to those governmental rules.

¶52        In response to this allegation, Eslam testified that he generally allowed his drivers to use a company debit card to buy themselves food. He stated that occasionally drivers would ask him if they could buy food for passengers on long rides where the passenger was unable to afford food for themselves. Eslam testified he allowed it "for certain people . . . on a humane basis but not to induce rides."

¶53        Bruce Yazzie testified that he understood from Eslam it was okay to buy meals to induce passengers to call you back, especially for those who took long rides. Yazzie testified he did not know at the time that it was illegal.

¶54        Husam Alsadi testified that Abed verbally authorized kickbacks and incentives to certain riders, but they had to publicly maintain the no kickback policy. Abed testified that providing meals or kickbacks to passengers was totally inappropriate and it would have resulted in termination had they known about it.

¶55        The superior court found:

>         Persuasive evidence demonstrated that E&M drivers regularly purchased meals for riders after long trips. The [c]ourt did not find credible Eslam's testimony that these meals were provided only for "humane" purposes. E&M

15

provided its drivers with debit cards to purchase gas and food. The [c]ourt finds that this was a common practice of which E&M and Eslam were aware. The [c]ourt finds Mr. Yazzie credible when he testified that Eslam told him it was okay to buy meals for rides greater than 100 miles.

On the other hand, the [c]ourt finds that the provision of meals for riders was a common practice, not just with E&M but also with other subcontractors. The [c]ourt[] suspects that A&N was well aware of the practice but attempted to maintain plausible deniability in the event of a government audit. Although E&M's conduct violates the contract, there was no persuasive evidence that A&N was sanctioned by AHCCCS or will otherwise suffer damages arising from this breach of contract. In short, although A&N proved a breach of contract, A&N failed to meet its burden of proving damages.

¶56            The record supports the superior court's conclusions. Therefore, we affirm the denial of A&N's claims relating to improper meal incentives.

## VI.    Bad Faith and Fraud By A&N and Application of the Economic Loss Rule

¶57            Finally, A&N asserts that the superior court's findings of bad faith and fraud are erroneous and, regardless, any damages are barred by the economic loss doctrine. Finding clear and convincing evidence of bad faith and fraud, we affirm.

¶58            The duty of good faith and fair dealing is implied in every contract. *See Rawlings v. Apodaca*, 151 Ariz. 149, 153 (1986).  To prove fraud, Eslam was required to establish:

    (1) a representation by A&N; (2) its falsity; (3) its materiality; (4) defendants' knowledge of its falsity or ignorance of its truth; (5) defendants' intent that it should be acted upon by Eslam and in the manner reasonably contemplated; (6) Eslam's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury.

*See KB Home Tucson, Inc. v. Charter Oak Fire Ins. Co.*, 236 Ariz. 326, 333, ¶ 31 (App. 2014) (quoting *Nielson v. Flashberg*, 101 Ariz. 335, 338–39 (1966)).

Fraud must be established by clear and convincing evidence. *Enyart v. Transamerica Ins. Co.*, 195 Ariz. 71, 77, ¶ 18 (App. 1998).

**¶59**      The bad conduct at issue is multifaceted. The majority of such conduct has been described herein, including the withholding of E&M's final payout, the recoupment of rides provided and paid to other subcontractors, and the allocation of the OIG fees. Two other areas remain to be discussed: A&N's systematic misrepresentations of ride totals that led to the regular underpayment of payouts in 2014 and the failure by A&N to pay for certain "missing rides."

**¶60**      Based on a tip from Husam Alsadi, Eslam began investigating his 2014 payouts. Eslam learned that spreadsheets created by Ned each pay period were doctored. It was only by adding the rides manually that Eslam discovered that he had been underpaid by $64,776.51 in 2014. When asked about this at trial, Ned admitted that the numbers at the bottom of the column were less than the sum derived from straight addition. Ned explained this by stating that he had gone in and made a manual offset to account for recoupments, which he claimed to be entitled to due to late denials by AHCCCS. However, the existence of manual offsets were not communicated to the subcontractors, and A&N did not provide subcontractors with any specifics about which rides Ned manually offset. The reason Ned gave for his failure to provide that information was that it was "too much work." Given that Abed routinely kept track of and charged subcontractors for administrative expenses—down to the cost of photocopies—that testimony was not credible.

**¶61**      A&N did not reimburse subcontractors for the 2014 underpayments. A&N asserted at trial that one of the loans was in fact a reconciliation payment. But the superior court explicitly found that transfer was the disbursement of the third loan, not a reimbursement or a reconciliation payout. But Ned admitted there were no remaining documents to support the amounts he took as deductions because the documents were destroyed after each individual pay period.

**¶62**      The manner in which A&N kept their books was misleading and purposefully opaque. Subcontractors were not always paid for rides and did not have a method of knowing, at least before 2015 or 2016, which rides had been approved and paid. Subcontractors had to rely on A&N's accounting, regarding both earnings and deductions, which was later determined to be false. To further complicate matters, A&N's data disappeared after each billing period.

**¶63**        The superior court concluded that the 2014 underpayments, the missing rides, and the withholding of the final 2016 payout were all material breaches of the contract and excused E&M's performance under the contract. The court further found that A&N breached either its contract with E&M or the implied covenant of good faith and fair dealing. We agree and affirm the court's fraud and bad faith determinations.

**¶64**        Finally, A&N claims that E&M's fraud damages are barred by the economic loss rule. To this end, A&N cites *Cook v. Orkin Exterm. Co.*, 227 Ariz. 331, 332, 335 n.6 (App. 2011), for the proposition that the economic loss rule limits recovery to a party's contract damages even in the face of fraud. The superior court awarded E&M contract damages in the following amounts: $64,776.51 (underpayments in 2014) + $74,987.25 (missing rides) + $86,412.79 (payouts withheld in July and August 2016) + $1,866.27 (OIG chargeback) + $717.84 (charged for another subcontractors mistake) for a total of $228,760.66. The court further found Sahnad established contract damages for underpayment of the 2014 rides in the amount of $3,336. The court also clarified that the 2014 damages were the same amounts as the pertinent fraud damages, and that Eslam was not entitled to a double recovery.

**¶65**        Generally, the law merely requires "a reasonable basis in the evidence for the trier of fact to fix compensation when a dollar loss is claimed." *Nelson v. Cail*, 120 Ariz. 64, 67 (App. 1978). We review damage awards for an abuse of discretion and the award "will not be disturbed on appeal except for the most cogent of reasons." *Fernandez v. United Acceptance Corp.*, 125 Ariz. 459, 464 (App. 1980). The computation of damages is a factual issue that we will uphold unless clearly erroneous. *See Elar Invs., Inc. v. Sw. Culvert Co., Inc.*, 139 Ariz. 25, 30 (App. 1983). The economic loss doctrine applies to tort claims when the parties already have a contract defining their relationship and may act to limit the recovery to contract damages. *See Sullivan v. Pulte Home Corp.*, 232 Ariz. 344, 346, ¶ 9 (2013); *Flagstaff Affordable Housing Ltd. P'ship v. Design Alliance, Inc.*, 223 Ariz. 320, 323, ¶ 11 (2010). But here the superior court specifically ruled that A&N was not entitled to double recover; thus, the only import of the fraud holding is that it imposes personal liability on Ned and Abed, and the economic loss doctrine is inapplicable.

## VII.    The Attorney Fee Awards Below

**¶66**        The superior court initially awarded $213,163.75 in attorney fees against A&N pursuant to A.R.S. § 12-341.01(A).[11] The court awarded another $12,100 in attorney fees against A&N after judgment.  We will not disturb an award of fees if it is supported by "any reasonable basis." *Desert Mountain Props. Ltd. P'ship v. Liberty Mut. Fire Ins. Co.*, 225 Ariz. 194, 213 (App. 2010).

**¶67**        A&N argues on appeal it should have been the successful party below and therefore any fee award to E&M must be reversed. As we have affirmed the judgment in favor of E&M on all counts, A&N's argument is unpersuasive. The award of attorney fees below is affirmed.

## VIII.    Attorney Fees on Appeal

**¶68**        Both E&M and A&N request an award of attorney fees on appeal pursuant to A.R.S. § 12-341.01(A). In the exercise of our discretion, we award E&M its attorney fees. As the successful party, E&M may also recover its costs upon compliance with ARCAP 21.

### CONCLUSION

**¶69**        For the above stated reasons, we affirm the superior court's ruling.



AMY M. WOOD • Clerk of the Court
FILED:  AA

---

[11]       We cite to the current version of any statute unless the statute has changed since the events in question and that change would materially affect the result.