NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

ROBERT BROWN,
*Plaintiff/Appellee/Cross-Appellant*,

*v.*

ARIZONA NATURES WELLNESS, et al.,
*Defendants/Appellants/Cross-Appellees*

No. 1 CA-CV 23-0524

FILED 09-19-2024

Appeal from the Superior Court in Maricopa County
No. CV2016-007874
The Honorable Bradley H. Astrowsky, Judge

**AFFIRMED AS MODIFIED**

COUNSEL

Barrett & Matura, P.C., Scottsdale
By Jeffrey C. Matura, Melissa J. England, John J. Daller
*Counsel for Defendants/Appellants/Cross-Appellees*

Jennings Haug Keleher McLeod Waterfall, LLP, Tucson
By Corey B. Larson
*Counsel for Plaintiff/Appellee/Cross-Appellant*

---

**MEMORANDUM DECISION**

Judge Samuel A. Thumma delivered the decision of the Court, in which Presiding Judge Maria Elena Cruz and Judge Andrew M. Jacobs joined.

---

**T H U M M A**, Judge:

¶1         In this fraudulent transfer and unjust enrichment action, defendant Arizona Natures Wellness (ANW) challenges the superior court's denial of its motions for judgment as a matter of law and for new trial. ANW also challenges an award of attorneys' fees to plaintiff Robert Brown. For the reasons below, the judgment is affirmed as modified.

## FACTS AND PROCEDURAL HISTORY

¶2         ANW was issued a license to operate a dispensary under Arizona's Medical Marijuana Act (AMMA). *See* Ariz. Rev. Stat. (A.R.S.) §§ 36-2801 to -2822 (2024).[1] ANW's license is not transferrable and ANW has no shares that can be sold or transferred. The AMMA requires a dispensary to "be operated on a not-for-profit basis," A.R.S. § 36-2806(A), meaning ANW's earnings are not distributed to members, directors or officers. *See Kromko v. Ariz. Bd. of Regents*, 149 Ariz. 319, 321 (1986). Given these limitations, it is common for a dispensary license-holder to enter into a services agreement with a management company that, for a fee, handles all aspects of a dispensary's marijuana business.

¶3         In and after 2013, ANW was operating a retail medical-marijuana dispensary in Phoenix through a services agreement with Tier Management, LLC. The ANW services agreement was Tier's primary asset. In January 2013, Medpoint Management, LLC, purchased Tier. In that transaction, "Medpoint essentially purchased management control of ANW and the revenue stream from ANW's management fee became payable to Medpoint." By August 2013, the ANW dispensary was operated under the "Bloom" brand name as a fully integrated medical marijuana business.

---

[1] Absent material revisions after the relevant dates, statutes and rules cited refer to the current version unless otherwise indicated.

¶4            In August 2013, Brown loaned Medpoint $100,000. The Brown Loan was for 12-months, with a 23 percent interest rate. The Brown Loan agreement stated that Medpoint was providing management services for ANW. It is undisputed that Brown has not received repayment of any principal or interest for the Brown Loan,[2] which resulted in this litigation.

¶5            In December 2013, Medpoint and ANW entered into a services agreement, superseding the Tier services agreement. The fee ANW paid Medpoint under this agreement was "Medpoint's principal or sole source of revenue."

¶6            Other individuals and entities became involved at different points of time. Among them, Bloom Master Fund I, LLC (BMF) was formed in 2013. At some point, Future Health Group, LLC, a Nevada limited liability company, was formed and became the manager of BMF.

¶7            In May 2014, ANW terminated the Medpoint services agreement. A few days later, BMF acquired some of Medpoint's assets but none of its liabilities. Medpoint then transferred something called Infinite Bloom, which employed Medpoint's sales and cultivation personnel, to BMF in exchange for $11,000. Also in June 2014, Medpoint licensed its intellectual property to Bloom IP Industries, LLC, a wholly owned subsidiary of BMF, for $8,000 per month.

¶8            Nearly two years later, in May 2016, dissatisfied that Medpoint had paid nothing on the August 2013 Brown Loan, Brown filed this case. In the 40-page complaint,[3] Brown pressed 17 counts against Medpoint, ANW and more than 30 other defendants. Many of those claims and defendants are no longer a part of this case and are not addressed here.

¶9            In February 2019, Brown filed a second amended complaint, the operative pleading here. Although shorter (26 pages) and asserting fewer counts (10) than the original complaint, the second amended complaint named more than 30 defendants, including Medpoint and ANW.

---

[2] The trial testimony contradicts this stipulation, indicating Brown received at least one payment of $5,750 from a Bloom Master Fund I (BMF) account. That apparent discrepancy is not dispositive in this appeal.

[3] Although the original complaint included co-plaintiff 7511 IRA Investments, LLC, that entity later settled its claims, was dismissed as a party and is not a part of this appeal.

Significant motion practice followed, with some counts against some defendants dismissed by the court before trial.

¶10            In September 2019, Brown settled his claims against Medpoint and others (the Medpoint Group) in a written settlement agreement requiring the Medpoint Group to make certain payments to Brown. The Medpoint Group, however, failed to comply with the terms of that settlement agreement. At Brown's request, and without objection, in November 2021, the court entered a consent judgment in favor of Brown and against the Medpoint Group for $250,000, with interest at 10 percent until paid in full.

¶11            Brown's remaining claims were resolved in a four-day jury trial starting in late November 2022. The focus here is on the claims against ANW. Brown testified that Medpoint represented to him that the proceeds from the Brown Loan would go toward equipment and supplies for use at ANW. Trial evidence also addressed the May/June 2014 restructuring, in which ANW terminated its service agreement with Medpoint; almost immediately entered into a similar service agreement with BMF; and BMF acquired Medpoint assets and intellectual property for use of the "Bloom" name. Trial evidence also indicated that ANW's facilities had the same equipment and assets before the termination of Medpoint's service agreement and during BMF's subsequent service agreement.

¶12            Brown testified, without objection and on cross-examination, about the settlement agreement and consent judgment with the Medpoint Group. Among other things, Brown testified he had not received any payment in satisfaction of that $250,000 consent judgment. As discussed below, both attorneys discussed that settlement and consent judgment during closing, with ANW arguing that evidence supported a defense verdict and Brown countering nothing had been paid on the consent judgment.

¶13            The court granted in part, and denied in part, defendants' timely motions for judgment as a matter of law (JMOL). *See* Ariz. R. Civ. P. 50(a). As a result, the only claims submitted to the jury were five counts Brown asserted against ANW.

¶14            While deliberating, the jury submitted a question asking if it could award damages consistent with the "amount, conditions, and dates" in the consent judgment: "[i]n essence, can we use the same formula employed in [the consent judgment] just with a different responsible party?" Without objection, the court responded that if the jury found for

4

Brown on one or more of the counts, it must enter a dollar value on the verdict form, and the amount entered would be left to their discretion.

¶15           After deliberation, the jury returned defense verdicts for ANW on Brown's counts for (1) aiding and abetting breach of fiduciary duty; (2) fraud and (3) aiding, abetting, and encouraging tortious conduct. The jury returned verdicts for Brown and against ANW on Brown's fraudulent transfer and unjust enrichment counts, awarding Brown $339,860.48 in damages.

¶16           Brown then sought $154,834.98 in attorneys' fees under A.R.S. § 12-341.01(A); $4,230.89 in taxable costs and $52,972.09 as sanctions under Ariz. R. Civ. P. 68, given ANW failed to accept offers of judgment. In February 2023, the court entered a final judgment awarding Brown (1) $339,860.48 in damages; (2) $69,172.50 in attorneys' fees; (3) $807 in taxable costs and (4) $52,972.09 in Rule 68 sanctions, all with interest until paid in full.

¶17           ANW then filed a renewed motion for JMOL on the two verdicts for Brown, or in the alternative, a motion for a new trial, arguing the verdicts and final judgment were "not supported by the evidence or the law" and that the "damages . . . awarded were excessive." The court denied the motions, noting "the jury was properly instructed, and there were facts presented to support their verdict." Finding ANW's renewed JMOL motion "was made without substantial justification," the court sanctioned ANW under A.R.S. § 12-349, awarding Brown additional attorneys' fees and costs.

¶18           ANW timely appealed, and Brown timely conditionally cross-appealed. This court has jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution and A.R.S. §§ 12-120.21(A)(1) and -2101(A)(1).

## DISCUSSION

I.      **ANW Has Not Shown the Court Erred in Denying ANW's Rule 50 Motion on Brown's Fraudulent Transfer and Unjust Enrichment Claims.**

¶19           This court reviews the denial of a motion for JMOL de novo, *Glazer v. State*, 237 Ariz. 160, 167 ¶ 29 (2015), drawing all reasonable inferences and viewing the evidence in favor of the non-moving party, *Dawson v. Withycombe*, 216 Ariz. 84, 95 ¶ 25 (App. 2007). A court should enter JMOL only if it "finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." ARCAP 50(a)(1). Stated differently, a JMOL is proper only if "the facts produced in

support of the claim . . . have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim." *Warne Invs., Ltd. v. Higgins*, 219 Ariz. 186, 194 ¶ 33 (App. 2008).

**¶20**        Where, as here, the court submits the matter to the jury after denying a motion for JMOL, a party may file a post-verdict "motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." Ariz. R. Civ. P. 50(b). In considering such a post-verdict motion, a court will "view the evidence in a light most favorable to upholding the jury verdict," *McBride v. Kieckhefer Assocs.*, 228 Ariz. 262, 265 ¶ 10 (App. 2011), recognizing "[i]t is the jury's burden alone to weigh the credibility of witnesses and draw inferences from the evidence presented at trial," *Zuluaga v. Bashas, Inc.*, 242 Ariz. 205, 212 ¶ 21 (App. 2017). A superior court has broad discretion in resolving a motion for new trial. *See State v. Fischer*, 242 Ariz. 44, 50 ¶ 21, 48 ¶ 11 (2017) ("Arizona courts use essentially the same standard" for new trial motions in civil and criminal cases.). This court will affirm a ruling on a motion for new trial "absent a clear abuse of discretion." *Delbridge v. Salt River Project Agric. Improvement & Power Distrib.*, 182 Ariz. 46, 53 (App. 1994).

### A.        Fraudulent Transfer.

**¶21**        Brown alleged a fraudulent transfer claim under Arizona's Uniform Fraudulent Transfer Act (UFTA). *See* A.R.S. §§ 44-1001 to -1010. UFTA provides that a transfer made by, or obligation incurred by, a debtor is fraudulent if the debtor made the transfer or incurred the obligation with an intent to hinder, delay or defraud any creditor of the debtor. *See* A.R.S. § 44-1004(A)(1). UFTA also provides that a transfer is fraudulent if made by the debtor "without receiving a reasonably equivalent value in exchange . . . and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer." A.R.S. § 44-1005. "The statutes governing fraudulent transfers focus on the validity of the transfer itself, providing creditors with remedies not only against the debtor and the property but also against transferees." *Rogone v. Correia*, 236 Ariz. 43, 51 ¶ 27 (App. 2014) (citations omitted).

**¶22**        On appeal, ANW argues the fraudulent transfer claim failed as a matter of law because "Brown was required to" (but failed to) "present evidence that Medpoint transferred to ANW the $100,000 loan proceeds received from Brown or an asset Medpoint purchased with those proceeds." ANW also argues Brown did not present evidence of "discussions or written documents regarding how Medpoint used his loan

proceeds." Brown, however, was not required to directly trace the specific proceeds from the Brown Loan to a specific asset that Medpoint transferred to ANW. He needed only to provide evidence that proceeds of the Brown Loan were transferred, directly or indirectly, from Medpoint to ANW. The UFTA broadly defines "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset and includes payment of money, release, lease and creation of a lien or other encumbrance." A.R.S. § 44-1001(9). "This broad statutory definition clearly includes any transaction in which a property interest was relinquished." *State ex rel. Indus. Comm'n v. Wright*, 202 Ariz. 255, 257 ¶ 8 (App. 2002).

¶23 Trial testimony indicated that neither Medpoint's nor ANW's financial records were well kept, precluding tracing of the proceeds from the Brown Loan to a specific asset. Brown, however, testified that he was told that the proceeds of the Brown Loan would be used by Medpoint for equipment and supplies for use at ANW. At the time of the Brown Loan, ANW's operations "involve[d] the cultivation, growing, marketing and selling of medical marijuana." As ANW's management company, Medpoint was tasked with managing ANW's retail dispensary and cultivation facilities, which included employees, equipment and supplies.

¶24 The trial evidence showed ANW terminated its services agreement with Medpoint in late May 2014, and almost immediately entered into a new services agreement with BMF. Various witnesses testified they visited ANW's facilities both before and after the termination of Medpoint's services agreement and saw the same assets, including the same employees, the same equipment, computers and tables, and the same "giant safe" used to hold cash at ANW.

¶25 The owner of BMF testified he purchased BMF in June 2014 to manage ANW. He admitted that there was a variety of equipment at ANW when BMF took over management of ANW, immediately after termination of Medpoint's service agreement. Although adding the equipment needed to be replaced, his testimony showed that ANW's facilities already had equipment when he took over from Medpoint, including computers, desks and a safe. Brown and other witnesses confirmed that the equipment at ANW's facilities originated with Medpoint and remained at ANW's facilities after BMF took over management of ANW.

¶26 On this record, a jury could reasonably conclude a transfer occurred when Medpoint purchased equipment with proceeds from the Brown Loan, and then left that equipment at ANW's facilities after the

services agreement with Medpoint terminated in late May 2014. *See Wright*, 202 Ariz. at 257 ¶ 8 (noting the broad definition of "transfer" in the UFTA "clearly includes any transaction in which a property interest was relinquished").

**¶27**       ANW presented evidence supporting its assertion that the assets remained from June 2014 and after because "BMF purchased those assets from Medpoint and then used them in its management of ANW." ANW also points to trial evidence that BMF "purchase[d] Medpoint's intellectual property with ANW" and "paid Medpoint $11,100 for the employees Medpoint used to manage ANW." Brown, however, presented controverting evidence that "permitted the opposite conclusion." *See Glazer*, 237 Ariz. at 167 ¶ 32. Brown also testified that proceeds from the Brown Loan were used for equipment needs, not for purchasing intellectual property.

**¶28**       The superior court provided the following explanation in denying ANW's motions addressing Brown's UFTA claim:

> The jury were instructed, via a stipulated instruction, that: "To prove his claim for actual fraudulent transfer, Brown must prove that Medpoint transferred an asset to [ANW] …" and "To prove his claim for constructive fraudulent transfer, Brown must prove that Medpoint transferred an asset to [ANW] …" The jury heard ample testimony from several witnesses who testified that they were present at the ANW location and saw the assets that existed and were purchased with their investment to Medpoint still being present after Medpoint was ousted. Witnesses for the Defendants testified in a similar manner. The jury weighed the admissions by Defendants' witnesses that ANW kept all of Medpoint's assets and, as the decider of fact, determined the truthfulness of the statements by such witnesses, including the attempts to downplay the value of the assets that were soon generating six-figure monthly profits for ANW without paying back Brown. As the jury was properly instructed, and there were facts presented to support their verdict, the Court will not disturb

same. In short, the jury found that Medpoint
can't get away with promising something to
somebody, getting an asset from that person,
and then attempt to later get out of paying back
that person as promised because they engaged
in legal maneuvering [to] avoid their obligation
after having benefitted from (and continue to
benefit from) the asset provided.

The trial evidence fully supports these conclusions.

### B.    Unjust Enrichment.

**¶29**        For an equitable claim of unjust enrichment, a plaintiff must
show: (1) an enrichment; (2) an impoverishment; (3) a connection between
the two; (4) the absence of justification for the two and (5) the absence of a
remedy of law. *See Span v. Maricopa Cnty. Treasurer*, 246 Ariz. 222, 227 ¶ 15
(App. 2019). "[U]njust enrichment provides a remedy when a party has
received a benefit at another's expense and, in good conscience, the
benefitted party should compensate the other." *Wang Elec., Inc. v. Smoke
Tree Resort, LLC*, 230 Ariz. 314, 318 ¶ 10 (App. 2012) (citing cases). On
appeal, ANW argues "Brown failed to submit any evidence that ANW was
enriched without justification."

**¶30**        As with the UFTA claim, ANW argues that various witnesses
testified that BMF "purchased Medpoint's assets from Medpoint, and then
used those assets to manage ANW." ANW also argues that BMF, not ANW,
"received the benefit of these items." But, again, some witnesses relied upon
by ANW conceded during their testimony that there was equipment at
ANW's facilities that BMF did not purchase. The superior court provided
the following explanation in denying ANW's motions addressing unjust
enrichment:

> ANW claims there was no evidence of
> enrichment to it. However, there was trial
> testimony that the same assets that were
> purchased using Brown's loaned funds were
> then being used by ANW after the takeover. The
> jury was properly instructed on unjust
> enrichment, weighed the evidence, and reached
> a verdict. There was evidence presented that
> there was nary a distinction between Medpoint
> and ANW and, in any event, all the same

> equipment and personnel remained with "Bloom" a/k/a ANW without ANW having paid for it. Indeed, Defendants' witnesses admitted that the goodwill, equipment, and personnel remained and the jury was fully entitled to disregard their self-serving testimony that it had little or no value where it was very quickly generating six-figure monthly profits.

The trial record fully supports these conclusions. ANW has not shown a reasonable jury could not conclude that Medpoint purchased the equipment using proceeds from the Brown Loan and then left those assets at ANW's facilities without receiving payment from ANW.

¶31 On this record, ANW has not shown the superior court erred in denying its Rule 50 motions or that the court abused its discretion in denying its alternative motion for new trial under Rule 50(b).

## II. ANW Has Not Shown the Superior Court Erred in Denying its Rule 59 Motion Regarding Damages.

¶32 This court reviews a superior court's ruling on a Rule 59 motion for new trial for an abuse of discretion. *Delbridge*, 182 Ariz. at 53. ANW argues the jury's damages verdicts are not supported by the evidence. ANW argues that, at most, the jury could have awarded Brown $299,753.42 (the present value of the August 2013 Brown Loan as of the date of the verdict). ANW speculates that, instead, the $339,860.48 verdict represented the present value (as of the date of the verdict) of the September 2019 settlement agreement where Medpoint agreed to pay Brown $250,000 with 10 percent interest. ANW argues the jury exceeded "the maximum damages it could have awarded" by $40,107.06.

¶33 This court will affirm a ruling on a motion for new trial "absent a clear abuse of discretion," *id.*, recognizing "[i]t is primarily the province of the jury to determine the credibility of witnesses and to find the facts," *Fischer*, 242 Ariz. at 50 ¶ 19 (citations omitted). As Brown notes, "[t]he computation of the amount of damages which are not fixed is a matter within the discretion of the trial court – a factual determination – and unless clearly erroneous, will not be reversed on appeal." *Elar Invs., Inc. v. Sw. Culvert Co., Inc.*, 139 Ariz. 25, 30 (App. 1983).

¶34 In denying ANW's Rule 59 motion on damages, the superior court noted that the verdict rendered "was between 10% and 12% greater

than Brown's counsel requested in his closing," but adding that "ANW cannot point to anyplace in the record to support a claim that the jury award was the result of passion or prejudice or that it deviates materially from reasonable compensation." In challenging that ruling on appeal, ANW relies on *Soto v. Sacco*, 242 Ariz. 474 (2017), arguing "[t]he trial court ignored the direction set forth in *Soto*."

¶35        ANW concedes the verdict was not the result of passion or prejudice. Instead, ANW relies on the *Soto* directive that remittitur is indicated when a verdict represents "an exaggerated measurement of damages not supported by the evidence." 242 Ariz. at 478 ¶ 10. The superior court's conclusion that the verdict did not "deviate[] materially from reasonable compensation" appears to be a shorthand for this *Soto* directive.

¶36        ANW's core argument is based on the thought that the evidence presented during the trial showed the maximum amount of Brown's damages was $299,753.42. If the claim here was against Medpoint for breach of the Brown Loan, ANW's argument would have some force. But that is not the case. The claims are against ANW for fraudulent transfer and unjust enrichment. In damage instructions that are not challenged on appeal, the jury was told it would (for the UFTA claim) "determine the value of the asset or assets fraudulently transferred to" ANW "that should be made available to satisfy Brown's claim" and (for the unjust enrichment claim) determine the value of the benefit conferred upon ANW at Brown's expense. Thus, the contract damages model ANW tacitly relies on does not apply here.

¶37        ANW's arguments during trial also show the jury verdict need not be set aside. Without objection, the settlement agreement between Brown and Medpoint, and the resulting consent judgment for $250,000 plus 10 percent interest, were admitted in evidence. Brown testified about both, again without objection, and was cross-examined about both. Brown's testimony included that he had not been paid anything under the consent judgment, that he did not expect to get paid twice for what he was owed and that, if ANW was held liable, he would "sign [the consent judgment] over to them" and allow ANW to try to collect on it.

¶38        In closing arguments, ANW pointed to the consent judgment to argue that the jury should return a defense verdict. Spending significant time on the importance of the consent judgment, ANW argued that "rather than being paid $100,000 plus interest, [Brown] now has a legal judgment against the party that owes him the money for $250,000 plus interest." ANW then argued that "he's owed that money from Medpoint. Not from"

ANW. In response, Brown argued he had not "gotten paid a nickel" under the consent judgment and that, whatever the verdict, he would not be paid twice.

**¶39**        Having received that evidence and heard those arguments, during deliberations, the jury asked: "[i]f we decide to award damages, can we simply use the same amount, conditions and dates in the consent" judgment ($250,000 at 10 percent interest for a September 2019 settlement agreement as reflected in the consent judgment entered in November 2019) "rather than setting a dollar amount?" "In essence, can we use the same formula employed in [the consent judgment], just with a different responsible party?" Although the parties agreed the jury should specify "a dollar amount" for damages, not provide a formula, ANW did not object to the jury using the consent judgment as a basis for computing damages. Without objection, the court responded to the question by instructing the jury: "If you find in favor of Plaintiff on one or more counts, you must enter a dollar amount in Verdict Form 6 for the total damages you deem appropriate. The exact amount of damages is left to your discretion."

**¶40**        On this record, given this evidence and these arguments, ANW cannot show the jury awarded an "exaggerated measurement of damages not supported by the evidence." *See Soto*, 242 Ariz. at 478 ¶ 10. If ANW's speculation about what the verdicts represent is correct, the jury did use the same formula employed in the consent judgment, "just with a different responsible party," an approach to which ANW did not object when it had an opportunity to object. Accordingly, ANW has not shown that the superior court abused its discretion by denying the Rule 59 motion regarding damages.

### III.    A.R.S. § 12.341.01(A) Does Not Apply to Brown's Fraudulent Transfer Claim but Does Apply to Brown's Unjust Enrichment Claim.

**¶41**        "In any contested action arising out of a contract, express or implied, the court may award the successful party reasonable attorney fees." A.R.S. § 12-341.01(A). ANW argues the superior court erred in shifting fees because Brown's claims do not arise out of contract, a legal issue this court reviews de novo. *See Schwab Sales, Inc. v. GN Constr. Co., Inc.*, 196 Ariz. 33, 36 ¶ 9 (App. 1998). To determine whether a claim arises out of contract, this court will consider "the fundamental nature of the action rather than the mere form of the pleadings." *Ramsey Air Meds, L.L.C. v. Cutter Aviation, Inc.*, 198 Ariz. 10, 15 ¶ 27 (App. 2000). A claim does not fundamentally arise out of contract "[w]hen the duty breached is one

implied by law based on the relationship of the parties." *Id.* Thus, the dispositive issue "is whether the defendant would have a duty of care under the circumstances even in the absence of a contract." *Id.*

¶42        This court has held a fraudulent transfer claim is statutory, under the UFTA, meaning the "fundamental nature of the claim is one that does not arise out of contract." *Dooley v. O'Brien*, 226 Ariz. 149, 154 ¶ 20 (App. 2010); *accord Kennedy v. Linda Brock Auto. Plaza, Inc.*, 175 Ariz. 323, 325-26 (App. 1993) (holding statutory claim under Arizona's "Lemon Law," A.R.S. §§ 44-1261 to -1265, did not arise out of contract). Other than noting the verdict for Brown on the unjust enrichment claim, and that the common law recognized a fraudulent conveyance claim before the UFTA was enacted in Arizona in 1918, Brown has no real response for this proposition. Accordingly, to the extent the superior court awarded fees under A.R.S. § 12-341.01 for the UFTA claim, it erred.

¶43        The same is not true for the unjust enrichment claim. An unjust enrichment claim is equitable (not statutory) and can, in appropriate circumstances, be subject to a fee award under A.R.S. § 12-341.01. Whether such a claim is eligible for a fee award focuses on "the fundamental nature of the action," whether the specific claim asserted would not exist "but for" a contract and the relationship of the parties. *See Ramsey Air Meds*, 198 Ariz. at 15-16 ¶ 27. Here, the unjust enrichment claim arose out of the Brown Loan and would not have existed but for that transaction. The parties involved had related and at times ongoing involvement, contractually and otherwise, in operating ANW. The Brown Loan facilitated services and goods being provided for the benefit of ANW that Brown alleged (and the jury found) ANW retained to its enrichment. Stated differently, ANW could not have been unjustly enriched but for the breach of the Brown Loan. Thus, Brown was eligible for an award for his unjust enrichment claim.

¶44        Because one basis for an award of fees was valid and one was not, the parties may file supplemental briefs addressing a proper modified fee award as directed below.

## IV.     This Court Does Not Address Brown's Conditional Cross-Appeal.

¶45     Brown filed and briefed a conditional cross-appeal challenging the grant of judgment as a matter of law on various claims against other defendants as well as claims against ANW other than those addressed above. In his briefing on appeal, however, Brown stated his cross-appeal need only be addressed "[i]f this Court were to reverse or remand any decision of the trial Court." Because the judgment is affirmed, this court need not address the issues raised by Brown's conditional cross-appeal.

## V.     Attorneys' Fees and Costs.

¶46     Brown requests attorneys' fees incurred on appeal pursuant to A.R.S. § 12-341.01 and his taxable costs, while ANW requests its taxable costs incurred on appeal. Because it is not the successful party, ANW's request for costs is denied. Because Brown is the successful party, in the discretion of the court, he is awarded his reasonable attorneys' fees incurred on appeal regarding his unjust enrichment claim as well as his taxable costs incurred on appeal, contingent upon his compliance with ARCAP 21 as set forth in the separate order issued along with this memorandum decision.

## CONCLUSION

¶47     The judgment is affirmed as modified to reflect the reallocation of attorneys' fees to be addressed in supplemental briefing, the deadlines for which are set forth in a separate order issued along with this memorandum decision.

